Charles Laverne
SINGLETON, Petitioner,

v.

A.L. LOCKHART, Respondent.

No. PB–C–82–165.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 28, 1986.

Jeffrey M. Rosenzweig, Little Rock,
Ark., for petitioner.

Jack Gillean, Asst. Atty. Gen., Little
Rock, Ark., for respondent.

## MEMORANDUM OPINION

EISELE, Chief Judge.

On October 30, 1979, petitioner was sentenced to death by electrocution for capital felony murder, and life imprisonment for aggravated robbery. The conviction and death sentence for capital murder were affirmed by the Arkansas Supreme Court, but the aggravated robbery conviction and sentence were vacated on double jeopardy grounds. *Singleton v. State*, 274 Ark. 126, 623 S.W.2d 180 (1981). Certiorari was denied by the United States Supreme Court. Petitioner then sought permission to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure. Permission was denied by the Arkansas Supreme Court and an execution date was set for June 4, 1982. The Arkansas Supreme Court denied petitioner's request for a stay of execution. On June 1, 1982, this Court granted petitioner a stay of execution and petitioner's first petition for writ of habeas corpus was filed. Petitioner subsequently filed an amended petition. The State of Arkansas responded. An evidentiary hearing was held to resolve the factual issues.

The facts of the case were stated by the Arkansas Supreme Court, 274 Ark. at 128–29, 623 S.W.2d 180, as follows:

The victim, Mary Lou York, was murdered in York's Grocery Store at Hamburg on June 1, 1979. She died from loss of blood as a result of two stab wounds in her neck.

The evidence of guilt in this case is overwhelming. Patti Franklin saw her relative Singleton enter York's Grocery at approximately 7:30 p.m. on the day of the crime. Shortly after he entered Patti heard Mrs. York scream, "Patti go get help. Charles Singleton is killing me." Patti then ran for help. Another witness, Lenora Howard, observed Singleton exit the store and shortly thereafter witnessed Mrs. York, who was "crying and had blood on her," come to the front door. Police Officer Strother was the first to arrive at the scene and found Mrs. York lying in a pool of blood in the rear of the store. The officer testified Mrs. York told him that Charles Singleton "came in the store, said this is a robbery, grabbed her around the neck, and went to stabbing her." She then told Officer Strother that "there's no way I can be all right, you know I'm not going to make it. I've lost too much blood." Mrs. York was taken to the hospital in an ambulance and was attended by her personal physician, Dr. J.D. Rankin. While enroute to the hospital, she told Dr. Rankin several times that she was dying and that Singleton did it. Mrs. York died before reaching the emergency room of the hospital. Officer Strother also testified that during examination of the premises, he found a money bag on the floor near the cash register which was empty, except for about $2.00 in change. He also stated that the cash register had only a small amount of change in it.

Petitioner's grounds for the writ are briefly summarized as follows:

1. Petitioner was denied a jury panel of a cross-section of the community because the jury panel was selected in a racially discriminatory manner.

2. Petitioner was denied a jury of a cross-section of the community because of the manner in which potential jurors were summoned.

3. The jury was "death qualified."

4. The trial court failed to grant petitioner's motion for a change of venue.

5. Petitioner was denied effective assistance of counsel because his counsel:

a. Failed to challenge certain veniremen for cause;

b. Failed to conduct an adequate voir dire re challenges for cause;

c. Wrongly assented to the exclusion of a potential juror under *Witherspoon* who should not have been excluded;

d. Failed to make an adequate appellate record for review of voir dire;

e. Did not rehabilitate, for *Witherspoon* purposes, potential jurors excluded under that case.

6. Petitioner's rights at the guilt phase of trial were violated by:

a. The proposition of inconsistent defenses;

b. Failure to seek additional psychiatric examination;

c. The admission of purported dying declarations of the victim;

d. Admission of certain photographs of the deceased.

7. Petitioner's arrest and the introduction of certain evidence seized from him violated his Fourth and Fourteenth Amendment Rights.

8. The evidence adduced at trial was insufficient to support a conviction.

9. The Arkansas statutory scheme is void for vagueness and violative of the Constitution because of the overlapping definitions of capital and first degree murder.

10. The Arkansas statutory scheme is impermissibly vague in its element of "extreme indifference to the value of human life."

11. Petitioner's constitutional rights were violated at the *penalty* phase of the trial by:

a. Counsel's failure to prepare or present evidence in mitigation;

b. Counsel's making an inadequate and improper closing argument;

c. The jury's ignoring evidence of mitigating circumstances;

d. The vagueness of the definition of the term "pecuniary gain."

e. The failure to comply with procedural requisites.

12. The death penalty in this case violates the Constitution in that:

a. It was imposed despite the absence of valid and non-vague aggravating circumstances in that only one aggravating circumstance was argued by the prosecution;

b. The sentence was not in proportion to other death sentences. More aggravating circumstances were involved in other cases where death sentences were not given;

13. The death penalty itself is unconstitutional.

14. Petitioner is not mentally competent to be executed and to execute him would violate the Constitution under these circumstances.

Most of the questions presented by Mr. Singleton's petition for habeas corpus are questions of law based upon an established record. The hearing was devoted principally to issues relating to Mr. Wellenberger's effectiveness as Mr. Singleton's attorney and with respect to the manner in which the jurors were originally placed on the list of 800 and, later, chosen to serve on the Singleton panel.

Apparently, Mr. Singleton is not seriously challenging Mr. Wellenberger's effectiveness during the actual trial of his guilt or innocence. He does, however, raise questions about his effectiveness in challenging the jury selection system, in voir diring the jury, and in the handling of the penalty phase of the trial.

The standard governing the Sixth Amendment right to effective assistance of counsel was recently articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064–2065, 80 L.Ed.2d 674 (1984), in which the United States Supreme Court held:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence re-

sulted from a breakdown in the adversary process that renders the result unreliable.

\*   \*   \*   \*   \*   \*

When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate. The Sixth Amendment refers simply to counsel, not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See *Michel v. New York*, 350 U.S. 91, 100–101 [76 S.Ct. 158, 163–164, 100 L.Ed. 83] (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

With respect to the element of "prejudice," the Court had the following to say, 104 S.Ct. 2067–2068:

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Cf. United States v. Morrison*, 449 U.S. 361, 364–365, 101 S.Ct. 665, 667–668, 66 L.Ed.2d 564 (1981). The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

\*   \*   \*   \*   \*   \*

Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States v. Agurs*, 427 U.S. [97], at 104, 112–113, 96 S.Ct. [2392], at 2397, 2401–2402 [49 L.Ed.2d 342 (1976)],

and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, *United States v. Valenzuela-Bernal*, 458 U.S. [858], at 872–874, 102 S.Ct. [3440], at 3449–3450 [73 L.Ed.2d 1193 (1982)]. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.

In *Kellogg v. Scurr*, 741 F.2d 1099 (1984), the Eighth Circuit had the following to say about claims of ineffective assistance of counsel:

To succeed on a sixth amendment ineffective assistance of counsel claim, a defendant must show that his or her attorney failed to provide reasonably effective assistance which resulted in prejudice to the defense. *Strickland v. Washington* [466 U.S. 668], 104 S.Ct. 2052, 2064 [80 L.Ed.2d 674] (1984). Reasonably effective assistance may be defined as "the skill and diligence that a reasonably competent attorney would exercise under similar circumstances \* \* \*." *Thomas v. Lockhart*, 738 F.2d 304, 307 op. at 4 (8th Cir. July 5, 1984). Because "[t]here are countless ways to provide effective assistance in any given case," *Strickland*, 104 S.Ct. at 2066, and to offset the "distorting effects of hindsight," *id.* at 2065, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 2066. *See Wallace v. Lockhart*, 701 F.2d 719, 726 (8th Cir.), *cert. denied*, [464 U.S. 934], 104 S.Ct. 340 [78 L.Ed.2d 308] (1983); *Comer v. Parratt*, 674 F.2d 734, 736 (8th Cir.), *cert. denied*, 459 U.S. 856 [103 S.Ct. 125, 74 L.Ed.2d 108] (1982). To establish that an attor-

ney's inadequacy was also prejudicial, a defendant must show that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 104 S.Ct. at 2068.

An ineffective assistance of counsel claim presents a mixed question of law and fact. *Eldridge v. Adkins*, 665 F.2d 228, 236 n. 5 (8th Cir.1981), *cert. denied*, 456 U.S. 910 [102 S.Ct. 1760, 72 L.Ed.2d 168] (1982). Therefore, the presumption of correctness accorded the factual determinations of the state court under 28 U.S.C. § 2254(d), and those of the district court under the clearly erroneous standard of Fed.R.Civ.P. 52(a), applies only to the historical facts underlying the attorney's performance but not to the ultimate conclusion as to whether or not effective assistance has been rendered. *Thomas*, at 307 n. 3; *Strickland*, 104 S.Ct. at 2070. *Cf. Sumner v. Mata*, 455 U.S. 591, 597 [102 S.Ct. 1303, 1306, 71 L.Ed.2d 480] (1982).

\* \* \* \* \* \*

We recognize that while no single error of an attorney may violate the sixth amendment, multiple errors viewed cumulatively may be constitutionally infirm. *Harris [v. Housewright]*, 697 F.2d [202] at 206 [8th Cir.1982].

The record makes it clear that there was virtually no penalty phase trial. The question is: who was responsible for the failure to present evidence relating to mitigating factors at the penalty phase trial?

The Court credits the testimony of Mr. Wellenberger that he was concerned with and worked on the penalty phase from the time of his first conference with Mr. Singleton on June 14. He began preparation for that phase of the trial on June 14. He explained the penalty phase to Mr. Singleton long before the trial and also at the trial. He requested Mr. Singleton to provide him with a personal history and the names of persons who could provide mitigating evidence. And the Court accepts Mr. Wellenberger's testimony that he in fact subpoenaed a witness to testify at the penalty phase and had also planned to use Singleton and/or his mother. The Court is further convinced, and so finds, that Mr. Singleton alone made the decision not to put on any evidence even though this was against the direct and specific advice of Mr. Wellenberger. And Mr. Singleton was adamant in regard to this decision.

Mr. Wellenberger suggested that if Mr. Singleton chose not to testify he should nevertheless permit Mr. Wellenberger to put on a witness concerning Singleton's consumption of alcohol and marijuana and to try to get the Court to admit his handwritten personal history or, in the alternative, to call his mother for that purpose.

The Court also accepts Mr. Wellenberger's testimony that his client admitted that he killed Mary Lou York and that Respondent's Exh. 1 is Mr. Singleton's statement of the true facts made to his attorney and not—as stated by Mr. Singleton—simply a statement of what he "told" the police. Such an admission to one's lawyer is an important circumstance which affects strategy decisions.

The penalty phase was clearly deficient so the Court's decision turns upon the question of law: does the defendant or his attorney have the right to decide if evidence of mitigating circumstances should be introduced at the penalty phase? The Court is firmly convinced that Mr. Wellenberger would have put on such evidence if he had believed that the decision was his to make. However, he was convinced that under the law his client had the right and the authority to make that decision and therefore, after protest, accepted his decision.

Before discussing this issue, it is important to note the charges against Mr. Singleton, the Arkansas statutory basis therefor, and the Arkansas statutory procedures governing the trial thereof.

Mr. Singleton was charged by the Prosecuting Attorney in an Information filed on the 4th of June, 1979. Omitting the formal portions thereof it accuses:

[T]he defendant Charles Lavern Singleton of the crime of aggravated robbery, a Class A Felony committed as follows, to-wit: The said defendant on the 1st day of June, 1979, in Ashley County, Arkansas, did unlawfully, commit aggravated robbery when he entered York's Grocery in Hamburg, Ashley County, Arkansas, with the purpose of committing a theft armed with a deadly weapon, and in the commission of said theft did inflict death on the proprietor of said store, Mary Lou Youk, by stabbing her in the throat. Aggravated robbery is a Class A. Felony.

Thereafter, apparently later on the same day, the prosecutor filed a capital murder information in which he accused:

[T]he defendant CHARLES LAVERN SINGLETON of the crime of CAPITAL MURDER, A CLASS A FELONY committed as follows, to-wit: The said defendant on the 1st day of JUNE, 1979, in Ashley County, Arkansas, did unlawfully, commit capital murder when acting alone or with one or more other persons, he did rob or attempt to rob York's Grocery Store in Hamburg, Ashley County, Arkansas; and in the course of and in furtherance of the said felony, he did cause the death of May Lou York by stabbing her in the throat, under circumstances manifesting extreme indifference to the value of human life. Capital murder is a Class A Felony.

This latter charge was based upon Ark. Stat.Ann. § 41–1501(1)(a) which states in pertinent part:

A person commits capital murder if: (a) acting alone or with one or more other persons, he commits or attempts to commit ... robbery, ..., and in the course of and in furtherance of the felony, ..., he ... causes the death of any person under circumstances manifesting extreme indifference to the value of human life....

The trial of persons charged of capital murder is governed by the procedure set out in Ark.Stat.Ann. § 41–1301 (1947) in pertinent part as follows:

The following procedures shall govern trials of persons charged with capital murder:

(1) The jury shall first hear all evidence relevant to the charge or charges and shall then retire to reach a verdict of guilt or innocence.

\*  \*  \*  \*  \*  \*

(3) If the defendant is found guilty of capital murder, the same jury shall sit again in order to hear additional evidence as provided by subsection (4) hereof, and to determine sentence in the manner provided by section 1302 [§ 41–1302]; except that, if the state waives the death penalty, stipulates that no aggravating circumstance exists, or stipulates that mitigating circumstances outweigh aggravating circumstances, no such hearing shall be required, and the trial court shall sentence the defendant to life imprisonment without parole.

(4) In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in section 1303 [§ 41–1303] or any mitigating circumstances. Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters; but the admissibility of evidence relevant to the aggravating circumstances set forth in section 1303 [§ 41–1303] shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant or his counsel shall be permitted to present argument respecting sentencing. [Acts 1975, No. 280, § 1301, p. 500.]

The findings that are required to support a sentence of death are set forth in section 41–1302, Ark.Stat.Ann. (1947) as follows:

(1) The jury shall impose a sentence of death if it unanimously returns written findings that:

(a) aggravating circumstances exist beyond a reasonable doubt; and

(b) aggravating circumstances outweight [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; and

(c) aggravating circumstances justify a sentence of death beyond a reasonable doubt.

(2) The jury shall impose a sentence of life imprisonment without parole if it finds that:

(a) aggravating circumstances do not exist beyond a reasonable doubt; or

(b) aggravating circumstances do not outweight [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; or

(c) aggravating circumstances do not justify a sentence of death beyond a reasonable doubt.

(3) If the jury does not make all findings required by subsection (1), the court shall impose a sentence of life imprisonment without parole. [Acts 1975, No. 280, § 1302, p. 500; 1977, No. 474 § 11, p.—.]

"Aggravating circumstances" are identified and limited by section 41–1303 of Ark. Stat.Ann. (1947).

Aggravating circumstances shall be limited to the following:

(1) the capital murder was committed by a person imprisoned as a result of a felony conviction;

(2) The capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

(3) the person previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another victim;

(4) the person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim;

(5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

(6) the capital murder was committed for pecuniary gain; or

(7) the capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any government or political functions. Acts 1975, No. 280 § 1303, p. 500; 1977 No. 474 § 12, p.—.]

(8) the capital murder was committed in an especially heinous, atrocious or cruel manner. [Acts 1975, No. 280, § 1303, p. 500; 1977, No. 474, § 12, p. 1127; 1985, No. 833, § 1, p.—.]

Certain "mitigating circumstances" are identified in section 41–1304, but that section does not restrict such mitigating circumstances to those enumerated therein. Section 41–1304 states:

Mitigating circumstances shall include, but are not limited to the following:

(1) the capital murder was committed while the defendant was under extreme mental or emotional disturbance;

(2) the capital murder was committed while the defendant was acting under unusual pressures or influences or under the domination of another person;

(3) the capital murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse;

(4) the youth of the defendant at the time of the commission of the capital murder;

(5) the capital murder was committed by another person and the defendant was an accomplice and his participation relatively minor;

(6) the defendant has no significant history of prior criminal activity. [Acts 1975, No. 280, § 1304, p. 500.]

The legislative intent pertaining to the enactment of the above statutes, 41–1301—41–1307, is set forth in section 41–1308 which provides in part as follows:

It is the intention of the General Assembly of the State of Arkansas, in enacting sections 1301–1307 [§§ 41–1301—41–1307] of Chapter 13 of the Arkansas

Criminal Code to specify the procedures and standards pursuant to which a sentencing body must conform in making a determination as to whether a sentence of death is to be imposed upon a conviction of capital murder.

Section 41–1351 makes it clear that there are only two possible penalties for a person convicted of a capital offense: death or life imprisonment without parole.

The case went to trial on *both* the Informations quoted above, i.e., on the charges of aggravated robbery and also capital murder. It will be recalled that, although Mr. Singleton was convicted on both charges, the Supreme Court of Arkansas later set aside his conviction for aggravated robbery on double jeopardy grounds.

The trial court gave the following instructions with respect to the offense of capital murder:

> Charles Lavern Singleton is charged with the offense of capital murder. To sustain this charge, the State must prove the following things beyond a reasonable doubt:
>
> First: That Charles Lavern Singleton committed or attempted to commit the crime of robbery; and
>
> Second: That in the course of and in furtherance of that crime, Charles Lavern Singleton caused the death of Mary Lou York under circumstances manifesting an extreme indifference to the value of human life.
>
> As a part of the charge of capital murder, the State contends that the death of Mary Lou York occurred during the commission or attempted commission of robbery by Charles Lavern Singleton, or in immediate flight therefrom. To prove robbery, the State must prove beyond a reasonable doubt:
>
> That, with the purpose of committing a theft, or resisting apprehension immediately thereafter, Charles Lavern Singleton employed physical force upon another.
>
> If the crime of robbery is not proved to have been committed or attempted by

Charles Lavern Singleton, he is not guilty of capital murder.

> *    *    *    *    *    *

> In order to find that Charles Lavern Singleton is guilty of capital murder, you must find that he had the purpose to commit robbery and that he formed that intention before committing the homicide.
>
> It is not necessary that this state of mind to commit robbery or aggravated robbery existed for any particular length of time, but it is necessary that it was formed before the homicide act was committed. It is the existence of this state of mind to commit robbery which distinguishes capital murder from other homicides.

> *    *    *    *    *    *

> When a death occurs during the commission or attempted commission of another crime or in immediate flight therefrom, capital murder is proved only if that other crime constituted robbery and all other elements of capital murder are proved.

After the arguments of the attorneys and an explanation of the verdict forms, the jury retired and, after deliberating, returned with their verdicts. They found Mr. Singleton guilty of aggravated robbery and on that charge, sentenced him to both a term of life imprisonment and a fine of $15,000. They also found him guilty of capital felony murder. Thereupon, Mr. Wellenberger, Mr. Singleton's attorney, requested a short recess before proceeding to the penalty phase of the trial. This was opposed by the prosecutor. The court then decided to allow the defendant "about five minutes recess." Shortly, Mr. Wellenberger announced that the defendant was ready to proceed. The following then occurred:

THE COURT: Very well. Proceed, Mr. Gibson.

MR. GIBSON: Does the Court feel it should do the instructions at this time or are you asking the parties if they want to put in any additional evidence?

THE COURT: I think you should put on any additional—

MR. GIBSON: The State has no additional evidence, Your Honor.

MR. WELLENBERGER: The Defense has no additional evidence, Your Honor.

THE COURT: Ladies and gentlemen, members of the jury, you have found Charles Lavern Singleton guilty of capital murder.

\* \* \* \* \* \*

THE COURT: ... After hearing arguments of counsel, you will again retire to deliberate and decide whether he is to be sentenced to death by electrocution or to life imprisonment without parole.

In determining which sentence shall be imposed, you may be required to make specific written findings as to the existence or absence of aggravating or mitigating circumstances. Appropriate forms will be provided for you and I'm going to instruct you on the procedures that you must follow.

The court went on to explain "aggravating circumstances" and "mitigating circumstances," and then stated:

In no event will you return a verdict imposing the death penalty unless you unanimously make three particular written findings of Form Three. These are:

First: That one or more aggravating circumstances existed beyond a reasonable doubt.

Second: That such aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found to exist; and

Third: That the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

If you make those findings, you will impose the death penalty. Otherwise, you will sentence the defendant to life imprisonment without parole.

After you have made your determinations on Forms One and Two and have reflected your conclusions on Form Three, then you must check the appropriate verdict on Form Four. Each of you must sign the verdict form.

Thereupon the prosecutor, Mr. Gibson, asked if he could argue the "circumstances." Mr. Wellenberger objected, stating that "there had been no evidence introduced concerning these circumstances." After further discussion of the verdict forms, the court permitted argument over Mr. Wellenberger's objection. After reviewing the law with respect to "aggravating circumstances," Mr. Gibson stated:

I submit to you only one existed and that is the murder was committed for pecuniary gain, that the Defendant at the time of the commission of the murder—although it wasn't, we don't have any evidence as to the amount.—the evidence is beyond a doubt that he was in the commission of a robbery, that he intended to steal money.

So that aggravating circumstance presents itself. And I'm sure you have already found that to have existed.

You will now be asked to retire to make that specific finding as to whether or not you have found that. And if you cannot find that, then you cannot impose the death penalty.

Form Two has a list of six possible mitigating circumstances, and a place for you to specify any others that you may find existed. I submit to you there has been no evidence of any mitigating circumstances, none whatsoever in this case.

\* \* \* \* \* \*

Now, a lot of the people feel that when a person puts another person to death that he should suffer the same punishment. The State of Arkansas provides death by electrocution. And Mary Lou York suffered a worse death at the hands of this defendant.

The entire argument of the defendant's attorney, Mr. Wellenberger, was the following:

MR. WELLENBERGER: Ladies and gentlemen, it's been a long trial. You've sat and listened to the evidence and you've made your decision. I don't believe any one of you would like to take a

man's life and I think you will do what's proper. I know you are people of conviction, and if it is required then that's what you'll do. If you don't think it's required, you will not. I know that none of you will make this decision lightly. I have absolutely nothing to say to you in regard to it. I do not envy you having to make the decision. And I trust that you would deliberate now and reach what you feel is proper in this case.

After the jury retired to commence its deliberations upon the penalty, the following occurred:

MR. WELLENBERGER: At the conclusion of the guilt phase of the trial and after the jury had rendered its verdict, I asked the Court for a short recess so I could confer with my client concerning the evidence that he wanted introduced into the record concerning mitigating circumstances. I have available a witness that would testify as to the fact that he was under the influence of alcohol and drugs which is a mitigating circumstance. I advised him of this but he said he did not want to enter any evidence whatsoever concerning anything; that he wanted to allow them to just go on and do what they wanted to do. Over my objections and against my advice, he insisted that I maintain that position and that I say nothing further.

After deliberating, the jury returned and sentenced Mr. Singleton to death by electrocution.

The verdict forms revealed that the jury found one aggravating circumstance beyond a reasonable doubt, to wit: "The capital murder was committed for pecuniary gain." The jury also found "there was no evidence of any mitigating circumstances."

The Court has carefully reviewed all of the arguments and points raised by the petitioner which challenge his conviction for the crime of capital murder and concludes that none of them have merit. The Court was concerned during the hearing about the jury empaneling and selection procedures but the evidence presented by the state has removed any effective challenge based upon that ground.

There are three issues relating to the penalty phase of the trial which deserve discussion, one of which requires the court to set aside the death sentence imposed upon the petitioner. The other two involve questions of statutory construction which have not yet been dealt with by the courts of the state of Arkansas.

**CLIENT OR ATTORNEY: WHO HAS THE RIGHT TO DECIDE IF EVIDENCE OF MITIGATING CIRCUMSTANCES, WHERE AVAILABLE, WILL BE INTRODUCED PURSUANT TO SECTION 14–1301, *et seq.?***

As the Court pointed out in its discussion above, Mr. Wellenberger, the attorney for the petitioner, did not put on evidence of mitigating circumstances, although he had some such evidence, because he was instructed not to do so by his client, Mr. Singleton. Mr. Wellinberger was convinced that, under the law, his client had the right to make that decision. The Court will discuss the law which pertains to that issue.

The State contends that the issue should be controlled by those cases dealing with the right of a person, *previously convicted,* to terminate further appeals or habeas petitions.

One of the leading cases dealing with that issue is *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). The facts were that on November 14, 1976, Gary Mark Gilmore was convicted of murder and sentenced to death after a jury trial in a Utah court. On December 3, 1976, the Supreme Court of the United States entered a stay of execution pending the filing of a response by the State of Utah together with the transcripts of various hearings. On December 13, 1976, the Supreme Court entered its Order and Opinion upon the issues raised. The Order stated, inter alia:

After carefully examining the materials submitted by the State of Utah, the Court is convinced that Gary Mark Gilmore made a knowing and intelligent

waiver of any and all federal rights he might have asserted after the Utah trial court's sentence was imposed, and, specifically, that the State's determinations of his competence knowingly and intelligently to waive any and all such rights were firmly grounded.

Accordingly, the stay of execution granted on December 3, 1976, is hereby terminated.

The Supreme Court divided 5 to 4 in its decision to terminate the stay of execution.

The background is interesting. On December 2, 1976, Bessie Gilmore, the mother of Gary Mark Gilmore, filed the application for a stay of execution as her son's "next friend." On December 8, 1976, Gary Mark Gilmore filed a response challenging the standing of Bessie Gilmore to initiate any proceedings on his behalf. Chief Justice Burger and Justice Powell were of the opinion that, assuming the Court would otherwise have jurisdiction with respect to a "next friend" concept, that "jurisdiction would arise only if it were demonstrated that Gary Mark Gilmore is unable to seek relief in his on behalf." They went on to state that in view of Gary Mark Gilmore's own response of December 8, 1976, the "next friend" concept would be inapplicable to the case:

> Since Gary Mark Gilmore has now filed a response and appeared in his own behalf, through his retained attorneys, any basis for the standing of Bessie Gilmore to seek relief in his behalf is necessarily eliminated. The only possible exception to this conclusion would be if the record suggested, despite the representations of Gary Mark Gilmore's attorneys, that he was incompetent to waive his right of appeal under state law and was at the present time incompetent to assert rights or to challenge Bessie Gilmore's standing to assert rights in his behalf as "next friend."

After examining the transcripts and reports of the state's proceedings and Gary Mark Gilmore's response of December 8, 1976, Justices Burger and Powell were convinced that Gary Mark Gilmore, knowingly and intelligently, with full knowledge of his rights to seek appeal to the state of Utah, had waived that right. Those justices further agreed that the state's determinations of Gilmore's competence to waive his rights knowingly and intelligently "were firmly grounded." With this record, the Court went on to state:

> It is plain that the Court is without jurisdiction to entertain the "next friend" application filed by Bessie Gilmore. This Court has jurisdiction pursuant to Act III of the Constitution only over "cases and controversies," and we can issue stays only in aid of our jurisdiction. 28 U.S.C. §§ 1651, 2101(f). There is no dispute, presently before us, between Gary Mark Gilmore and the State of Utah, and the application of Bessie Gilmore manifestly fails to meet the statutory requirements to invoke this Court's power to review the action of the Supreme Court of Utah. No authority to the contrary has been brought to our attention, and nothing suggested in dissent bears on the threshold question of jurisdiction.

Justices Stevens and Rehnquist concurred that Gilmore was competent to waive his right to an appeal but they went on to emphasize also that "his access to the courts is entirely unimpeded and therefore a third party has no standing to litigate an Eighth Amendment claim—or indeed any other claim—on his behalf." They concluded that, "without a proper litigant before it, this Court is without power to stay the execution."

A similar problem was dealt with by the Ninth Circuit in *Lenhard, et al. v. Wolff,* 603 F.2d 91 (1979), where an appeal was taken from the district court's denial of a writ of habeas corpus and of an emergency application for stay of execution. Mr. Lenhard and Mr. Fransen, deputy public defenders of Clark County, Nevada, attempting to appeal as next friend acting on behalf of Jessie Walter Bishop, who had been sentenced to death, filed the application for stay and the appeal. It appeared that Bishop pled guilty to nine felony charges including murder and was sentenced to death on February 10, 1978. During the course

of the arraignment, Bishop moved to dismiss his court-appointed counsel, the public defenders, making known that he desired to plead guilty to all of the charges. The court ordered a psychiatric examination of his competence to do so. He was examined by three psychiatrists and, based upon their conclusions, was found to be competent to enter a guilty plea, to discharge his attorneys, and to represent himself. The trial court permitted Bishop then to act as his own counsel but ordered the public defenders to stand by to render any assistance that Bishop requested. After a penalty hearing before a three-judge panel, Bishop was sentenced to death. On the mandatory appeal to the Nevada Supreme Court, Bishop at first consented to being represented by the public defenders, but later changed his mind and then sought to have the appeal dismissed. The Nevada Supreme Court declined to dismiss and ruled on the merits affirming the conviction.

Lenhard and Fransen, acting under ethical and moral obligations, filed the petition for writ of habeas corpus and the stay of execution. The district judge denied the petitions on the ground that Lenhard and Fransen had no standing to act as "next friend" of Bishop. The Ninth Circuit Court of Appeals stated:

Bishop himself has steadfastly maintained that he does not wish to seek relief in the federal courts and refuses to authorize any petition for habeas corpus or stay of execution to be filed on his behalf. Most recently he appeared in open court at the hearing before the district court on August 23, 1979 and declared that he believes he has a constitutional right to waive any rights to a federal appeal and desires to do so. He maintained he was intelligently and competently exercising his right to refrain from seeking relief from the federal courts.

The petitioners concede that if Bishop is competent he may indeed refuse to pursue relief in the federal courts, acknowledging that this is in accord with the holding of *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976).

The issue as framed by the petitioners is that the execution should be stayed until a competency hearing can be held to determine Bishop's competence to waive possible relief in the federal courts. Petitioners contend this is mandated by *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), wherein the Supreme Court remanded for such a hearing. In *Rees*, however, there was conflicting psychiatric evidence concerning the competence of Rees. In that case Rees had been found by one psychiatrist to be mentally incompetent.

■ In this case, in contrast, there has been no showing of Bishop's incompetence.

The Court, after reviewing the evidence bearing on Bishop's competence, stated, "We find that there has been no evidence sufficient to warrant a hearing on the issue." The court concluded:

■ It is clear from the testimony of Bishop before the district court that he does not authorize and in fact contests the right of these petitioners to bring the writ of habeas corpus or to request stay of execution. Therefore, under the holding of *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), petitioners lack standing to bring the writ or request the stay.

The application for stay of execution is denied and the appeal from the denial of a writ of habeas corpus is dismissed.

Judge Snead concurred, pointing out that *Rees v. Peyton*, did not control, "because there exists on the record now before us no evidence that causes us to experience doubt concerning Bishop's capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation."

This Court recently ruled in the case of *Fairchild v. Lockhart*, Case No. PB–C–85–282, that *Gilmore* and *Lenhard* gave Fairchild the right to abandon his habeas corpus petition if the Court was convinced that Fairchild was competent and was making the decision with full knowledge of all the pertinent facts and circumstances. All that

is needed is a knowing and an intelligent decision made by a person whose competence has been firmly grounded.

But the Court is convinced that *Gilmore* and *Lenhard* do not control the issue presently before the Court. In both of those cases, the entire trial, including both the guilt and penalty phases, had been completed. Here, it is argued that there is a fundamental defect in the penalty phase of Singleton's trial: no evidence was submitted of mitigating circumstances, as contemplated by the Arkansas statute, although such mitigating circumstance evidence was available. Should the decision not to participate in the penalty phase of the trial belong only to the defendant, or does the state have an independent interest in requiring the production of evidence of mitigating circumstances so that the sentencing body will have all of the evidence contemplated by the statute (i.e., the evidence of both the aggravating and the mitigating circumstances) before making the choice between the penalty of death and life without parole?

The case of *Trimble v. State*, 693 S.W.2d 267 (Mo.App.1985) dealt with a strikingly similar factual situation. There, Mr. Trimble was convicted of capital murder and the jury imposed the death sentence. The conviction and sentence were affirmed upon direct appeal to the Supreme Court of Missouri. In his post-conviction proceeding he raised fourteen points relative to the sentencing or penalty phase and eight relating to the determination of guilt. Because of its finding of ineffectiveness of counsel at the guilt-innocence phase, the Missouri Court of Appeals ordered a new trial but it nevertheless went on to deal extensively with the claimed errors in the sentencing process. The Court began its discussion by describing the factual background:

> Movant, at trial, at sentencing, and in this Rule 27.26 proceeding, has resisted all efforts by his counsel to raise any issue with respect to the imposition of the death penalty. There can be no doubt of movant's settled intention to instruct his counsel in this area. At trial, he specifically instructed counsel that no

evidence in mitigation be offered and that no argument be made in the penalty phase of the trial.

One of the differences between this case (Singleton's) and Mr. Trimble's case should be noted. When the conflict between the attorney and client arose in the latter case the trial judge was apprised of the situation. He thereupon conducted an extensive hearing to determine that Trimble was making a voluntary and informed choice in instructing his attorney not to present evidence or argument in mitigation.

The trial court found that Mr. Trimble had in effect made a knowing and voluntary waiver of counsel in directing his attorney not to present evidence or argument at the sentencing hearing. In the Missouri Court of Appeals, Trimble's attorney asserted this to be error, although Trimble himself, pro se, reiterated his desire not to challenge the sentencing phase. Other alleged deficiencies in the sentencing phase were also asserted on the appeal. The Missouri Court of Appeals stated:

> These claims are aggregated because a single issue is dispositive of them all. Movant's settled purpose to not raise these claims and his equally strong and unequivocal direction to counsel to refrain from action at the trial and appellate levels cannot be doubted. The question posed is the ineffectiveness of counsel in failing to take action to introduce and argue the following evidence, despite that direction.

In *Trimble* there was apparently much evidence which could have been introduced by way of mitigation, whereas in the case here (Singleton), this potential was limited to testimony concerning the defendant's background and his use of alcohol and marijuana prior to the murder.

The attorneys for Trimble argued that, in criminal cases, there are only three decisions which must be made by the client: (1) what plea to make; (2) whether to waive a jury trial; and (3) whether to testify on his own behalf. They contended that all other strategic and tactical decisions were within

the exclusive province of the lawyer to decide after consultation with his client. The state responded by asserting that cases like *Gilmore* and *Lenhard* controlled. The Missouri Court of Appeals distinguished those authorities as follows:

> The cited authority and the argument do not fully address the issue posed here because these cases all relate to the prisoner's choice after a trial in which the normal defense function has occurred. The cases cited relate to the question of the right of appeal. The claim in the instant case attacks the trial proceeding itself, which presents a different issue.

The court then went through a discussion of the U.S. Supreme Court cases establishing the constitutional parameters within which the death penalty might appropriately be imposed. Out of these principles grew the bifurcated system of trial under which the sentencing authority receives information relevant to sentencing and also the standards to guide its use of that information. The Missouri Legislature passed a capital murder statute responsive to the U.S. Supreme Court case. The Missouri Court of Appeals noted:

> It is not the bifurcated proceeding that is vital. Rather, it is the information and guidance given to the sentencing authority which enables it to exercise discretion in imposing the death penalty without random, freakish, or discriminatory results. *Gregg* [*v. State of Georgia*], *supra*, 428 U.S. [153] at 153, 96 S.Ct. [2909] at 2909 [49 L.Ed.2d 859 (1976)].
>
> These procedures are, of course, a protection to the individual accused, but also serve an entirely separate purpose. It must be remembered that *Furman* invalidated the death penalty statutes of about 39 states and avoided the death penalty for hundreds of prisoners awaiting trial and execution under those statutes. In validating subsequently enacted statutes, the *Gregg* court stressed that a sentencing procedure, giving the jury individualized information about the defendant and guidelines for applying that information, vitiated the random and disproportionate imposition of the death

penalty, and thus avoided the constitutional attack made in *Furman.*

> Essential to the Missouri statutes' application of the death penalty, is the finding by the jury that the aggravating circumstances outweigh the mitigating circumstances. The finding of an aggravating circumstance is but the threshold question. The jury must then weigh the evidence before it imposes the death penalty.
>
> The Missouri statute thus presupposes the constitutional requirement and embodies it in the statute.

The court accepted that the jury function was neglected in the sentencing phase of the trial because only Trimble's age was submitted in mitigation. If this deficiency had been occasioned by the decision of Trimble's attorney, then it is clear that ineffectiveness would have been established under the *Strickland* test. The Missouri Court of Appeals then reached its decision using the following analysis:

> The difficulty in the case arises from the manner in which the issue is posed. Here, we have no inadvertence or neglect of counsel. Trial counsel was prepared to offer the evidence and argument, and urged his client, movant, to permit that effort. Movant was obdurate. He did not want that course pursued. Even the trial court's warning that movant's chosen course of action would, in all probability, result in the death penalty, failed to persuade him.
>
> The issue is thus to determine trial counsel's duty in this unusual situation. The state urges that counsel had no duty to act, as the client has essential control of the case. It buttresses the argument by citing Missouri Supreme Court Rule 4, Code of Professional Responsibility, E.C. 7–7 and 7–8, asserting these ethical canons make it plain that the decision was for the client, and the lawyer must accept the client's determination, even though contrary to the lawyer's advice. Movant's counsel asserts that ABA Standard for Criminal Justice Sec. 4–52 restricts the client's control to plea entry,

jury waiver, and right to testify. The state says that the ABA Standards have not been approved, and that *State v. Thomas*, 625 S.W.2d 115 (Mo.1981), is on all fours with the present case. In *Thomas*, the defendant directed his attorney not to present insanity or diminished capacity, a defense which counsel suggested was viable in the case. The court held an extensive hearing and counsel complied with defendant's direction. On appeal, the claim was made that counsel was ineffective. The court quoted and relied upon Missouri Supreme Court Rule 4, E.C. 7-7, holding it was not a breach of duty for the lawyer to accede to the client's demands after fully informing him of his rights. The court further held:

> While a defendant has a Sixth Amendment right to effective assistance of counsel, he may not be forced to accept this assistance if his decision to represent himself is informed and voluntary. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Similarly, he may not be forced to accept major decisions of trial strategy if he is fully informed and voluntarily decides not to follow the advice of his lawyer. It would be absurd to say that a defendant may waive the assistance of counsel entirely and yet may not waive the benefit of counsel's advice with respect to a particular decision, such as whether or not to assert a particular defense. The Court in *Faretta* stated that the Sixth Amendment 'speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant.' *Id.* at 820, 95 S.Ct. at 2533.

*State v. Thomas, supra*, 625 S.W.2d at 124.

The state is not fully correct in asserting the ABA Standards have not been approved. In *State v. Fitzpatrick*, 676 S.W.2d 831 (Mo. banc 1984), the court cited *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and the standards utilized therein, and upheld counsel's right to decide, independently of the client's wishes, whether to request a mistrial. The *Fitzpatrick* rationale and holding run contrary to the rationale and holding in *Moore*. These cases demonstrate the continuing difficulty in determining defense counsel's role in the criminal trial. Many cases protect counsel from claims of ineffectiveness on the ground of a tactical choice made despite the client's wishes. On the other hand, when situations such as *Moore* are presented, the courts talk in terms of waiver. Thus, the cases find no error when counsel accedes to client demand, even though the accession may not be a wise choice. On the other hand, the lawyer's choice made contrary to the client's wishes will also be approved, even where the wisdom, in hindsight, may be dubious, on the ground that counsel has control of the decisional process and must have such control to be effective. Despite pious pronouncements about the necessity for independence of counsel, *Strickland, supra*, 104 S.Ct. at 1064, the surest way to avoid a claim of ineffectiveness is to abdicate to the client's wishes, no matter how ill-advised, and to make a record. There is more than a little hint that the courts are concerned with counsel and client "sand bagging" the court with error predicated upon counsel and client agreeing upon a course of conduct which demonstrates egregious harm to the defendant. In *Lahmann v. State*, 509 S.W.2d 791 (Mo. App.1974), the court held that a client's and counsel's joint decision for counsel to sit mute through the trial could not serve to vitiate the trial. The *Lahmann* court cited *Thomas v. State*, 475 S.W.2d 98 (Mo.1971), where counsel, with the defendant's agreement, failed to act as counsel, eschewing cross-examination, tender of evidence, and argument. The court held that, if error could be predicated upon such conduct, the defendant and his counsel could present an absolute barrier to conviction.

■ The facts of the instant case present, in sharp relief, a conflict be-

tween the constitutional principle of *Gregg* and the principles developed to guide the application of the Sixth Amendment right to counsel. Writing upon a clean slate, the decision might be to give precedence to the principle of *Gregg.* The decisions in *Moore* and *Thomas,* however, require this court to find that counsel was not ineffective in acquiescing in the movant's desires concerning the evidence and argument at the punishment stage of the trial.

As will be noted, the Missouri Court, with some misgivings, went along with the two Missouri decisions, *State v. Thomas,* 625 S.W.2d, 115 (Mo.1981) and *State v. Moore,* 615 S.W.2d 108 (Mo.App.1981).

Two important, unavoidable inferences can be drawn from the *Trimble* case, assuming that case is correct: (1) that the Missouri capital murder statute with its penalty phase procedures does not require that mitigating evidence, when available, be presented at the sentencing phase, and (2) that the result in *Trimble* does not violate any constitutional requirements. It should be noted that the court in *Trimble* almost reluctantly reached its decision. It felt obligated to follow the Missouri Supreme Court cases which it believed to be contrary to the teaching of *Gregg,* whereas, had it been "writing upon a clean slate," the decision might have been otherwise.

Before leaving *Trimble,* it is important to note that the *Thomas* case, upon which it relied, arose out of a different factual situation. At the guilt-innocence phase of the trial, the defendant directed his attorney *not* to present evidence of insanity or diminished capacity even though his attorney felt that such defenses might be viable. After an extensive hearing on the issue, the defendant's attorney was permitted to comply with his client's instructions. On appeal, the claim was made that counsel was ineffective. If the client is competent to stand trial and to work with his attorney, can it be said that he does not have the right to determine which defenses, if any, he wishes to present? In *Trimble* the critical issue did not arise until *after* the

defendant's conviction of capital murder. The state's interest, after conviction, in requiring the penalty phase to meet statutory or constitutional requirements is different.

A conclusion directly contrary to *Trimble* was reached in *People v. Burgener,* 41 Cal.3d 505, 224 Cal.Rptr. 112, 714 P.2d 1251 (1986). The factual background was stated by the court:

> Defendant did not participate in the penalty phase of his trial, and defense counsel presented no mitigating evidence or argument on his behalf during this stage of the proceeding. Defense counsel made clear to the court, in a discussion held in chambers, that he had proposed to call in mitigation a psychiatrist, the defendant's parents, and a person who served in prison at the same time as defendant, but that defendant had instructed him not to do so. Defendant personally confirmed these instructions. The People then presented evidence of incidents of defendant's violent behavior during prior periods of incarceration as well as evidence of prior felony convictions for such charges as battery, robbery, and attempted murder. Defense counsel, acting on direction of his client, stipulated to the evidence.

At the conclusion of the prosecutor's argument, the defendant's attorney read a short statement prepared by his client in which he requested the jury to return a sentence of death. The court decided the issue as follows:

> In *People v. Deere,* supra, 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925 [1985], we recently held that the failure of defense counsel to present any mitigating evidence in the penalty phase of a capital trial, in obedience to his client's request, required that the penalty be set aside. We emphasized the state's interest in a reliable penalty determination, and observed: "To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no

less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling." (*Id.,* at p. 364, 222 Cal.Rptr. 13, 710 P.2d 925.) And, we concluded: "We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice (Cal. Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all." (*Id.,* at p. 368, 222 Cal.Rptr. 13, 710 P.2d 925.)

\*     \*     \*     \*     \*     \*

The fact that defense counsel deliberately refrained from introducing any evidence in support of a lesser penalty than death, though such evidence was available, in itself requires penalty reversal under *Deere.*

The case, *People v. Deere,* 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925 (1985), upon which the court relied in *Burgener,* discussed the problem in considerably more detail. In the *Deere* case the court explicitly makes the distinction between guilt phase decisions and penalty phase decision. The court stated:

> Appellate counsel now suggests that defendant's very acts of pleading guilty to a capital offense and waiving a jury trial amounted to a "suicide attempt" which disclosed his incompetence. The record does indicate that defendant felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death. But that attitude does not necessarily demonstrate an incompetence to stand trial or to plead guilty. His plea and waiver were concurred in by counsel. As stated in [*People v.*] *Teron,* at the guilt phase a defendant bears no duty to present a defense or to rebut the People's case, and the fact that he declines to present a defense does not demonstrate a lack of capacity to waive his rights. (23 Cal.3d [103] at p. 115, 151 Cal.Rptr. 633, 588 P.2d 773 [1979].)

Then the court turned its attention to the contention that the sentence of death must be set aside because of the failure of the defense counsel to offer any mitigating evidence during the penalty phase of the trial apart from the defendant's own statement and some testimony at a preliminary investigation and a suppression hearing. The client's statement was to the effect that he knew he had done wrong, believed in an eye for an eye, and felt that he should die for his crime. The attorney went along with Deere's instructions "based on his desires and my conclusion that I have no right whatsoever to infringe on his decisions about his own life."

The opinion in *Deere* first discusses the case of *People v. Stanworth,* 71 Cal.2d 820, 80 Cal.Rptr. 49, 457 P.2d 889 (1969) where the defendant not only sought to waive a jury trial on penalty but also attempted to dismiss his attorney so that no evidence would be presented on his behalf. He also made it clear that he wanted to die. The *Deere* court then stated:

> *Stanworth* cited *People v. Werwee* (1952) 112 Cal.App.2d 494, 500, 246 P.2d 704, for the proposition that " 'Although a defendant may waive rights which exist for his own benefit, he may not waive those which belong also to the public generally.' " (*People v. Stanworth,* supra, 71 Cal.2d at p. 834, 80 Cal.Rptr. 49, 457 P.2d 889.) It further quoted (ibid.) from *People v. Blakeman* (1959) 170 Cal. App.2d 596, 598, 339 P.2d, 202, the view that " 'The fallacy of this argument is that we are not dealing with a right or privilege conferred by law upon the litigant for his sole personal benefit. We are concerned with a principle of fundamental public policy. The law cannot suffer the state's interest and concern in the observance and enforcement of this policy to be thwarted through the guise of waiver of a personal right by an individual. "Any one may waive the advantage of a law intended [solely] for his benefit. But a law established for a public reason cannot be contravened by a private agreement." (Civ. Code, § 3513.)' "

To permit a defendant convicted of a potentially capital crime to bar his coun-

sel from introducing mitigating evidence at the penalty phase because he wants to die, as did this defendant, would likewise violate the fundamental public policy against misusing the judicial system to commit a state-aided suicide. It would also prevent this court from discharging its constitutional and statutory duty to review a judgment of death upon the complete record of the case, because a significant portion of the evidence of the appropriateness of the penalty would be missing.

This deficiency of the record implicates another paramount concern of the state: "in capital cases ... the state has a strong interest in reducing the risk of mistaken judgments."

\* \* \* \* \* \*

To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated.

Finally, the defense attorney's honest but mistaken believe that he had "no right whatsoever to infringe upon his [client's] decision about his own life" operated to deny defendant his right to the effective assistance of counsel. While counsel should of course endeavor to comply with his client's wishes to the maximum extent consistent with his legal and ethical responsibilities, he is not—contrary to popular misconception—a mere "mouthpiece." As we recently found it necessary to reiterate, "Once an attorney is appointed to represent a client, he assumes the authority and duty to control the proceedings. *The scope of this authority extends to matters such as deciding what witnesses to call,* whether and how to conduct cross-examination, what jurors to accept or reject, what motions to make, and most other strategic and tactical determina-

tions." (*People v. McKenzie* (1983) 34 Cal.3d 616, 631, 194 Cal.Rptr. 462, 668 P.2d 769, italics added.)

The rule clearly applies to the issue before us. In *People v. Frierson* (1979) 25 Cal.3d 142, 164–167, 158 Cal.Rptr. 281, 599 P.2d 587, we held that when mitigating testimony can be produced with due diligence, failure to call witnesses to give such evidence in the penalty phase of a capital trial deprives the defendant of effective assistance of counsel. A thorough review of this question concludes that at the penalty phase defense counsel has a critical obligation to present a case in mitigation, first, "to assure reliability in capital sentencing," and second, "to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die." (Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases* (1983) 58 N.Y.U.L.Rev. 299, 317–318 [hereafter Goodpaster, *The Trial for Life* ].) "Where potentially beneficial mitigating evidence exists and counsel has not presented it, counsel has precluded the sentencer from considering mitigating factors. Through failure to discover or present such evidence, counsel has 'create[d] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' " (Id. at p. 319, quoting from *Lockett v. Ohio,* [1978], supra, 438 U.S. [586] at p. 605, 98 S.Ct. [2954] at p. 2965 [57 L.Ed.2d 973].)

\* \* \* \* \* \*

When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, "the potential for prejudice is too obvious to require proof." (Goodpaster, *The Trial for Life,* supra p. 350.) Indeed, "short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision." (Id. at p. 354.) We have no doubt that a judgment of death imposed in such circumstances constitutes a

miscarriage of justice (Cal.Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all.

The judgment was therefore reversed as to penalty.

Justice Broussard concurred with the majority decision in *Deere* that:

> The State of California asserts an interest, independent from that of the defendant, in the accuracy of the penalty determination at a capital trial. (See *People v. Stanworth* (1969) 71 Cal.2d 820, 830–834, 80 Cal.Rptr. 49, 457 P.2d 889.) Both the 1977 death penalty law and the 1978 initiative plainly envision that this interest will be protected by an adversary proceeding in which the prosecuting attorney will present the aggravating evidence and defense counsel will present the mitigating evidence.
>
> \*    \*    \*    \*    \*    \*
>
> A penalty trial at which all mitigating evidence is withheld is inadequate to safeguard the state's interest in the reliability of penalty decisions; as the majority point out, it is equivalent to "no penalty trial at all." (at p. 934.)

However, Justice Broussard did not believe that the case should be considered one involving "ineffective assistance of counsel," stating:

> I hesitate, however, to describe this case as one involving "the ineffective assistance of counsel." The constitutional right to the effective assistance of counsel belongs to defendant personally. A man facing the awful alternatives of execution or life imprisonment without possibility of parole could rationally prefer execution, or at least feel that the comparative advantage of life imprisonment was not worth the humiliation and loss of dignity he believes entailed in the presentation of mitigating evidence. Here counsel satisfied himself that his client was making a rational, knowing, and intelligent decision, and then acted in accord with his client's wishes. I do not believe his conduct violated any constitutional right of defendant.

> Although counsel in this case fulfilled his obligations to his client, he failed to perform a role assigned to him by the state, that of presenting the mitigating evidence necessary to assure the reliability of the penalty determination. But the fact that the state assigns defense counsel a role which may require him to act contrary to his client's wishes on a matter of such vital importance to the client presents a troubling picture. The defense of a capital case often requires a close and trusting relationship between counsel and client; yet our decision requires counsel to violate that trust, to take a position against his client, and perhaps to present evidence revealed to him in confidence by his client.

> Trial courts should explore methods of alleviating this conflict. In some cases it might be desirable for counsel, in addition to presenting mitigating evidence, to inform the jury of defendant's personal position. In other cases, the court might permit the defendant himself to address the jury. Alternatively, the court could call persons with mitigating evidence as its own witnesses, or appoint new counsel to call them, and thereby place on the record the mitigating evidence essential to a careful, balanced penalty determination.

> In sum, both the state's need to assure the fairness and reliability of the penalty determination, and defendant's rights to personal choice and dignity, command respect. It is essential that the penalty trial constitute a balanced presentation of aggravating and mitigating evidence, but this goal should be achieved, as far as possible, with respect and accommodation for defendant's personal values and for his relationship with counsel.

> I therefore join in reversing the penalty judgment, not on the ground of incompetency of counsel, but because no steps were taken to assure a fair and balanced penalty trial. I am confident that we would not reverse a penalty judgment after the trial court had taken independent steps to assure a fair and balanced

penalty trial, even though the mitigating evidence was not presented by defense counsel.

It is clear from a reading of *Burgener* and *Deere* that those decisions are based upon statutory law. The court in both of these cases was interpreting state statutory and state constitutional provisions. Implicitly the Missouri Court of Appeals was doing the same thing in *Trimble* but, of necessity, was also upholding the federal constitutionality of the state statute as so interpreted.

The Arkansas law is very similar to that in both Missouri and California but the Arkansas courts have not had occasion to pass upon this particular issue of statutory construction. No federal constitutional issue would arise if Arkansas follows the California analysis.

It is not necessary for the Court to resolve this issue because it is granting petitioner relief from the death penalty under the *Collins* doctrine, *see infra*. However, if the Court is wrong on *Collins*, then this issue would have to be dealt with.

## MERCY OR NULLIFICATION JURY VERDICTS

Section 41–1302(1), Ark.Stat.Ann. (1947) provides:

(1) The jury shall impose a sentence of death if it unanimously returns written findings that: ·

(a) aggravating circumstances exist beyond a reasonable doubt; and

(b) aggravating circumstances outweigh [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; and

(c) aggravating circumstances justify a sentence of death beyond a reasonable doubt.

It is clear under Arkansas law that even if a jury finds one or more aggravating circumstances and that the aggravating circumstances outweigh the mitigating circumstances, the jury may nonetheless choose to impose a life sentence. *Williams v. State*, 274 Ark. 9, 621 S.W.2d 686 (1981); *Clines, et al. v. State* (1983), 280 Ark. 77, 656 S.W.2d 684. It is not clear under Arkansas law, however, whether if a jury also finds that the aggravating circumstances justify a sentence of death, the jury may nonetheless choose as an act of mercy to impose a sentence of life even though the statute states that the death penalty "shall" be imposed by the jury under such circumstances. Compare *State v. Melson*, 638 S.W.2d 342 (Tenn.1982), *cert. denied* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 and *Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984), *cert. denied*, 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306, with *People v. Brown*, 40 Cal.3d 512, 230 Cal.Rptr. 834, 726 P.2d 516 (1986) and *People v. Easley*, 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813 (1983).

If the language of the statute providing that if the three conditions are met, a death sentence "shall be imposed" were strictly interpreted, a jury could not under Arkansas law choose to show mercy to a defendant where a death sentence is justified.[1] Or, put another way, if the jury made the three requisite findings but nevertheless imposed a sentence of life without parole, would the Court be entitled to, or indeed be required to, set aside that sentence and impose a sentence of death?

In view of the Arkansas Supreme Court's views on the sanctity of jury verdicts in criminal cases and in view of the nullification doctrine, it might interpret the phrase "where aggravating circumstances justify a death sentence" broadly to effectively mean "where because of aggravating circumstances the jury feels it should impose the death sentence." Or, the Court might interpret the phrase "shall be imposed" broadly to mean "may be imposed." In either case, "mercy verdicts" would be permitted. And if such interpretations of the Arkansas statute are correct, then the

---

1. But even if the statute were strictly interpreted, a jury might arguably still be entitled to impose such a sentence under the nullification doctrine, and a defendant might be entitled to an instruction so informing the jury.

presently used jury instructions are wrong. Note the language of the charge in this case: "If you make those findings, you will impose the death penalty."

Because the Court is granting petitioner relief from the death penalty on the basis of the *Collins* doctrine, *see infra*, it is unnecessary for the Court to resolve this issue of statutory construction. If the Court is wrong on the application of *Collins*, then this issue would, of course, have to be dealt with.

## COLLINS ISSUE

Petitioner's habeas claim predates the Eighth Circuit Court of Appeals' decision in *Collins v. Lockhart*, 754 F.2d 258 (1985), which suggests an important constitutional basis for the petitioner's claim. The Court has been researching the issue. On August 22, 1986, petitioner's counsel wrote a letter to the Court directly raising and arguing the point. It is therefore incumbent upon the Court to review the *Collins* case.

Collins was charged with capital felony murder by an information alleging that he had killed John Welch "while engaged in the attempt and perpetration of robbery of John Welch." *Id.* at 262. The Washington County, Arkansas jury found Collins guilty in 1974 as charged. At the conclusion of the sentencing phase and pursuant to Arkansas statutory law, the jury further found three aggravating circumstances present, that these aggravating circumstances outweighed the mitigating circumstance of Collins' age, that these aggravating circumstances justified imposition of the death sentence, and that Collins should be executed for the offense. The three aggravating circumstances were (1) that Collins had committed a prior violent crime; (2) that he had created a substantial risk of death or serious physical injury to a person other than the victim; and (3) that he committed the murder for pecuniary gain. *Id.* at 262. The Arkansas Supreme Court affirmed his conviction and sentence upon remand from the Supreme Court of the United States which had ordered reconsideration in light of *Gregg v. Georgia*, 428

U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Collins' post-conviction petition for relief was subsequently denied. He then filed for federal habeas corpus relief in the Eastern District of Arkansas. The district court rejected all of the petitioner's claims and denied the requested relief. On appeal, Collins' case was initially sent back to the state supreme court for a determination of whether the sentence imposed was disproportionate when compared to those imposed in similar cases. The Arkansas Supreme Court held that it was not. Collins then went back to the United States District Court which again denied his claim. In his second appeal to the Eighth Circuit, Collins argued, *inter alia*, that the third aggravating circumstance found by the jury that had sentenced him to die, namely that he had killed "for pecuniary gain," was an essential element of the capital felony murder charge for which he was convicted and would apply to every person who was convicted of capital felony murder where robbery was the underlying felony involved. In other words, Collins claimed that pecuniary gain was *always* a circumstance that would exist in capital felony cases involving robbery and its automatic presence thus could not provide the jury with any basis for distinguishing capital murders which deserved the death sentence from others that did not. *Id.* at 261. In sum, Collins argued, the use of the statutory aggravating circumstance of pecuniary gain did not assist the jury in applying the death penalty in a manner deemed constitutionally acceptable in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Gregg, supra*. And, since the appellate court could not determine what impact this allegedly flawed circumstance may have had upon the jury's conclusion (in view of the fact that the jurors also had before them two other aggravating circumstances and one mitigating circumstance), Collins asked the court to set aside his death sentence.

The Eighth Circuit first considered whether or not the Arkansas court had passed on this question. *Id.* at 262. Although there was no express finding with

the Arkansas Supreme Court's decision, the circuit court inferred that the Arkansas court had rejected this novel theory. *Id.* at 262. Collins' trial counsel did make what the Eighth Circuit labeled the "pecuniary-gain argument" at the trial but the matter was not pursued on appeal. However, as the Eighth Circuit noted, it is the practice of the Arkansas Supreme Court to take up and consider all objections raised at trial. Since the Arkansas court held, after considering all possible errors, that the defendant had received a fair trial, the Eighth Circuit thus deduced that the Arkansas court had reviewed but found no merit in the argument. *Id.* at 262. Having thus determined that the highest court in the state had construed the Arkansas statute as permitting the practice of offering pecuniary gain as an aggravating circumstance upon conviction for capital felony murder where robbery is the underlying felony, the court of appeals turned to analyze the constitutionality of such an application of the Arkansas law. While this Court might anticipate that the Arkansas Supreme Court would read the state statute differently if the issue were overtly and squarely presented to it, the Court shall nevertheless accept the Eighth Circuit's inference that state law permits the use of "pecuniary gain" as an aggravating circumstance in such cases. It follows that this Court must also reach the federal constitutional issues.

In *Collins* the court noted that the prosecutor essentially admitted that the aggravating circumstance of pecuniary gain applied automatically to anyone convicted of robbery murder. As the prosecutor suggested in his argument to the jury, a finding of this aggravating circumstance required nothing more than the jury's reaffirming one of the elements upon which the defendant's conviction rested:

THE PROSECUTING ATTORNEY: You are instructed by the law that another aggravating circumstance that you shall consider is whether or not the commission of this particular crime was for pecuniary gain. *You have already determined that yesterday that this crime was committed by the defendant for money, for pecuniary gain.* I submit to you that is the third most aggravating circumstance in this case.

*Id.* at 263.

The prosecutor in the case before the Court sounded a strikingly similar theme when he argued the "pecuniary gain" circumstance to the jury which sentenced Singleton:

I submit to you only one [aggravating circumstance] existed and that is the murder was committed for pecuniary gain, that the Defendant at the time of the commission of the murder—although it wasn't, we don't have any evidence as to the amount.—the evidence is beyond a doubt that he was in the commission of a robbery, that he intended to steal money. So that aggravating circumstance presents itself. *And I'm sure you have already found that to have existed.* [emphasis added]

■ This acknowledged use of an aggravating circumstance which "duplicates an element of [the] crime itself" violates the Eighth Amendment of the Constitution as applied to the states through the Fourteenth Amendment. *Id.* at 263. As explained by Judge Arnold, writing for the Eighth Circuit:

Aggravating circumstances, in order to comply with the Eighth Amendment, must "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." [*Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2742–43 77 L.Ed.2d 235 (1983).] An aggravating circumstance is an objective criterion that can be used to distinguish a particular defendant on whom the jury has decided to impose the death sentence from other defendants who have committed the same underlying capital crime. Aggravating circumstances serve to reduce the danger that the death penalty will be wantonly or arbitrarily imposed, a danger that was

uppermost in the Court's mind when *Furman v. Georgia,* [citation omitted] was decided. Thus, in *Godfrey* [*v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)] the Court struck down an aggravating circumstance that was so vaguely and generally worded that it failed to narrow the class of persons eligible for the death penalty. "(S)tatutory aggravating circumstances play a constitutionally necessary function at the state of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant,* 103 S.Ct. at 2743.

We see no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform this narrowing function. Every robber-murderer has acted for pecuniary gain. A jury which has found robbery murder cannot rationally avoid also finding pecuniary gain. Therefore, the pecuniary-gain aggravating circumstance cannot be a factor that distinguishes some robber-murderers from others. In effect, a robber-murderer enters the sentencing phase with a built-in aggravating circumstance.

\*       \*       \*       \*       \*       \*

We conclude that pecuniary gain may not be used as an aggravating circumstance in this case, and that if no other statutory aggravating circumstances had been found, the death sentence would have to be set aside.

*Collins* at 264–265.

Because the Arkansas death penalty statute requires the jury to weigh aggravating circumstances against any possible mitigating circumstances, the *Collins* court further held that the presence of an invalid aggravating circumstance under Arkansas law meant that the sentencing verdict was entirely defective. This distinguishes the Arkansas law from those of Georgia and Florida which were addressed by the Supreme Court in *Zant* and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), respectively.

The instant case is exactly analogous to *Collins* with the exception that the jury found only *one* aggravating circumstance in petitioner Singleton's case as opposed to the three in *Collins.*

Thus, if the Court applies the holding of *Collins* to this case, petitioner's death sentence must be set aside. Before doing that, however, the Court will consider possible procedural objections which might arguably prevent the application of *Collins* to this case.

The Court notes that Singleton, unlike the petitioner in *Collins,* did not raise the "pecuniary gain" issue at trial. Nor did he ever raise it until the eleventh hour of this habeas corpus proceeding. In accordance with the principles of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), petitioner must show the requisite "cause" for this failure to comply with the state procedural obligation that all objections must be asserted at trial in order to be preserved.

The aim of *Wainwright* is to force the criminal defendant to assert all of his issues at the state trial level and remove any incentive he might have to "sandbag" there in the hope of saving some objections which he might use later to obtain a second shot in a federal forum. *Id.* 97 S.Ct. at 2508. So procedural defaults that result from tactical calculations will not constitute "cause," and the objection will be deemed waived. However, where the failure to make the objection is attributable to the "novelty" of the constitutional issue "at the time of the state court proceeding," the cause requirement of the *Wainwright* test is satisfied. *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1 (1984).

The Supreme Court in *Ross* found that if the issue was "reasonably unknown" to counsel, then it would be fair to presume that no intentional "strategic motives" lay behind the default. Thus the Court held:

> [W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in

accordance with applicable state procedures."

*Ross* 104 S.Ct. at 2910.

■ In the instant case, petitioner's trial counsel had very little if any indication that the "pecuniary gain" argument might inhere somewhere in the Supreme Court's decisions in *Gregg* and *Furman.* The Court knows of no line of either state or federal decisions that would have pointed petitioner's counsel in the direction of the *Collins* result. Thus, the Court concludes that there was no "reasonable basis" upon which petitioner's counsel should have been expected to predicate the pecuniary gain argument at the time of his state court trial.

It is worth noting that the *Ross* case dealt with the retroactive application of an intuitively more apparent constitutional principle that had been unrecognized at the time of the state trial. In that instance, the Supreme Court considered whether the petitioner should have objected that the state law required him to carry the burden of proving that he acted in passion or provocation and without malice when he killed the victim. *Id.* at 2904. The Court found that he could not have been expected to make this argument (which eventually felled the state statute), namely, that placing this burden upon the criminal defendant excused the prosecution from establishing beyond a reasonable doubt all the essential elements of the crime charged. The Court so held notwithstanding the fact that one circuit court had overturned a similar state law prior to the petitioner's trial. By comparison, at the time of Singleton's trial, as far as this Court is aware, no court had accepted the *Collins* argument. And, moreover, the Court believes that the constitutional principle established in this circuit by the *Collins* opinion is surely more subtle than that which the Supreme court labelled "novel" in *Ross.*

■ The Court anticipates that the state might also contend that the *Collins* decision should not be applied retroactively. The *Collins* opinion was delivered in January 1985. Although Singleton was tried and convicted on October 30, 1979, his habeas review was pending at the time *Collins* was decided. Since the instant claim had not been decided, it is by no means clear that the retroactivity doctrine even applies here. But in any event, the magnitude of the constitutional issues involved requires the Court to conclude that *Collins* should be applied, and retroactively, to this case. "Complete retroactive effect is most appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials." *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 1342, 79 L.Ed.2d 579 (1984).

Clearly then the instant case is governed by *Collins* and petitioner's death penalty is invalid. If there were other aggravating circumstances that the state had previously relied upon, the state would be free to conduct another sentencing phase trial and seek a valid death sentence. However, since the state here offered evidence of no other aggravating circumstances, removal of the lone "pecuniary gain" circumstance leaves the state with no basis in the trial record for the death sentence.

The question remains whether the state may retry the sentencing issue when it failed to prove at least one aggravating circumstance in the first trial as required by state law. In *Collins* it was arguable that the invalid aggravating circumstance of pecuniary gain was superfluous and that the jury could have imposed the death sentence based on the two other aggravating circumstances proved. But that is not the case here as there were no other aggravating circumstances submitted.

The question can only arise if the prosecution has evidence of other "aggravating circumstances" that it did not choose to use at the trial and if the prosecutor desires a retrial of the penalty phase. If the answer is "yes" to both of these propositions then the Court would have to determine if *Nelson v. Lockhart,* 641 F.Supp. 174 (E.D. Ark., 1986), and *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), foreclose that option on double jeopardy grounds.

Since the issue is not presently before the Court and has not been argued or briefed by the parties, the Court will withhold action on this issue for a short period. The state will advise the Court by September 30, 1986, whether it wishes to have a retrial of the penalty phase. If it does it will identify the aggravating circumstance or circumstances that it will attempt to prove and explain why it did not offer evidence thereof at the first trial. It will also brief the double jeopardy issue discussed in *Nelson* and explain why, under the law, it should be permitted a second opportunity to produce such evidence. The respondent will have until October 14, 1986, to file his brief in response.

The Court concludes that petitioner's challenges to his conviction for capital murder are without merit and that said conviction should in all respects be reaffirmed.

It is therefore ORDERED that petitioner's complaint attacking his conviction for the crime of capital felony murder be, and it is hereby, dismissed, said conviction being hereby in all respects reaffirmed.

It is further ORDERED that the death penalty imposed upon the petitioner on October 30, 1979, be, and it is hereby, set aside.

It is further ORDERED that the state advise the Court and the petitioner on or before September 30, 1986, whether it wishes to have a retrial of the penalty phase of the case. If it seeks such a retrial, it will also, by said date, file a brief and argument on the double jeopardy issue described above. The petitioner will have until October 14, 1986, to file any response required.

### ORDER

■ On August 28, 1986, the Court entered an order setting aside petitioner's death sentence. By that order the Court required the parties to submit additional pleadings with respect to questions as to whether the state wished to resentence petitioner and, if so, whether the Double Jeopardy Clause of the Fifth Amendment to the Constitution would prevent the respondent from asking a jury to impose the death penalty on petitioner again. The state has recently notified the Court that it does wish to retry the sentencing phase of petitioner's trial and would therein seek a capital sentence. The state's decision therefore requires the Court to address the double jeopardy issue suggested in the earlier order. Upon review of the parties' briefs and the recent caselaw, the Court is convinced that the state may *not* subject petitioner to the death penalty, again. Accordingly, the Court will order the state to reduce petitioner's sentence to life without parole. This Court's ruling on this issue at this time will permit a prompt appellate review of the important underlying issue.

To review briefly, the petitioner was convicted of capital felony murder in state court. Following his conviction, the state sought the death penalty, arguing to the jury a *single* aggravating circumstance: that the petitioner acted for pecuniary gain. The petitioner offered no mitigating circumstances and the jury found that the state had proved the one aggravating circumstance, "pecuniary gain," beyond a reasonable doubt; that this outweighed any mitigating circumstances; and that the petitioner should be executed.

After reviewing the petitioner's conviction and sentence pursuant to his habeas corpus petition, the Court affirmed the conviction but found that the state had not relied upon a valid aggravating circumstance and therefore imposition of the death sentence was unconstitutional. Governed by the Eighth Circuit's decision in *Collins v. Lockhart,* 754 F.2d 258 (1985), this Court held that the state had used a previously established element of the robbery-murder charge in offering "pecuniary gain" as an aggravating circumstance. Because there were no other aggravating circumstances offered upon which the jury might conceivably have relied, this Court concluded that the state had effectively failed to provide a basis for the capital sentence imposed by the jury.

Now the Court must consider whether the fact that the state relied at trial *solely*

upon an invalid aggravating circumstance precludes a second penalty phase trial in which the state would attempt to offer evidence of other aggravating circumstances that could support a death sentence. The state rightly concedes that the nature of the Arkansas death penalty statute does cause it to trigger double jeopardy considerations pursuant to the United States Supreme Court opinion in *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). However, the state asserts that in this particular situation jeopardy has not yet attached to the sentencing phase of petitioner's case because this Court has simply found that the one aggravating circumstance was "improper," that there has been no acquittal, and that resentencing is therefore permissible.

Regardless of the manner in which it is characterized, the fact is that the state at the original trial failed to prove circumstances that would justify imposition of the death sentence. Use of "pecuniary gain" was indeed "improper," and this invalid reliance leaves the respondent with absolutely no basis in the record for its attempt to prove the aggravation that recent Supreme Court decisions require before imposition of a capital sentence. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Thus, for purposes of the double jeopardy analysis, it must be said that the state failed to prove the requisite aggravation and that therefore the petitioner was effectively "acquitted" with respect to the state's case that he should be executed. Having been "acquitted" by virtue of this Court's decision on habeas review of the sentence, petitioner may not be forced to "run the gauntlet" of a second state effort to prove some proper aggravating circumstance or circumstances that might convince a new jury to impose the death sentence on petitioner. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), *Bullington v. Missouri*, *supra*.

The respondent relies chiefly on the recent Supreme Court decision in *Poland v. Arizona*, —— U.S. ——, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), to support its claim that the state may resentence petitioner. The Court has carefully reviewed the *Poland* opinion and concludes that the Supreme Court's May 1986 ruling does not sanction resentencing in the instant case. In *Poland* the petitioners were convicted of a double murder arising out of the robbery of a currency courier. During the penalty phase, the Arizona prosecutor argued that two aggravating circumstances were present and justifed imposition of the death sentence. The trial judge, who had the responsibility for sentencing under the Arizona law, rejected the prosecution's first circumstance of pecuniary gain on the theory that the applicable Arizona statute required proof of a contract murder, not simple evidence that the convicted individual intended to derive something of pecuniary value through his criminal act. The prosecution had offered no evidence that the defendants were hired killers. The judge did find, however, that the state had proved the other aggravating circumstance, namely that the murders were "especially heinous, cruel or depraved," and that this circumstance outweighed any mitigating circumstances. Thus the trial court sentenced the petitioners in *Poland* to death.

On appeal the Arizona Supreme Court held that the trial judge had, in essence, found the wrong reason for what may have been a lawful imposition of the death penalty. The court said that the sentencing court erred by finding sufficient evidence to support the aggravating circumstance of "heinous, cruel or depraved." But the Arizona Supreme Court also held that the trial judge had mistakenly construed the "pecuniary gain" statute when he ruled that it only applied to murder for hire, suggesting the possibility that, under the proper interpretation, he might find this circumstance present and issue a death sentence. Because the court also overturned the petitioners' underlying conviction, the case was remanded for a new trial.

Petitioners were again convicted and, again, the trial court imposed the death

penalty, relying on the aggravating circumstances of "pecuniary gain" and "heinous, cruel or depraved." Petitioners appealed to the Arizona Supreme Court a second time, arguing, *inter alia,* that the Double Jeopardy Clause barred a second sentencing phase since the Arizona court had reversed the trial judge's previous finding of the "heinous, cruel or depraved" circumstance that had supported the first death sentence. This, petitioner argued, constituted an acquittal on the death sentence by the Arizona Supreme Court. The Arizona court rejected that double jeopardy claim and affirmed the death sentence on the finding of the "pecuniary gain" factor. The Arizona court again determined that there was insufficient evidence to support the "heinous, cruel or depraved" circumstance and tossed out that factor. The United States Supreme Court granted certiorari to settle the question of

> whether the Double Jeopardy Clause bars a further capital sentencing proceeding when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty. *Poland* at 1751.

In short, the Supreme Court determined that double jeopardy did *not* preclude resentencing the petitioners in *Poland.* A brief glance at the holding might first suggest that *Poland* authorizes the respondents in the instant case to resentence Singleton. Closer inspection of the opinion, however, reveals that there was no former jeopardy in the Arizona Supreme Court's ruling because the appellate court did not conclude that the record lacked any evidence to support the requested death penalty but merely struck the sentencing court's finding with regard to a particular aggravating circumstance. Thus, the *Poland* case is distinguishable from the instant case in a critical way. Namely, this Court found nothing else in the record to support the death sentence after it was determined that "pecuniary gain" was invalidly offered. The Arizona Supreme Court, in contrast, after finding insufficient evidence on the "heinous, cruel or depraved" circumstance, went on to also find that the trial court had wrongly interpreted the "pecuniary gain" statute. It further concluded that had the trial court properly construed this state statute, the sentencing court might have imposed the death sentence on the basis of the evidence placed in the record by the prosecutor:

> Upon retrial, if the defendants are again convicted of first degree murder, the court may find the existence of this [pecuniary gain] aggravating circumstance. *Poland* at 1752, citing 132 Ariz., at 286 [645 P.2d 784]

It should be noted, in addition, that the trial court had plainly stated that, although he had found the "pecuniary gain" circumstance to apply only to contract killings, "if this presumption is inaccurate, the evidence shows the defendants received something of pecuniary value," and further indicated that such evidence "would be an aggravating circumstance." *Poland* 106 S.Ct. at 1752.

On this record, the U.S. Supreme Court found that neither the sentencing court nor the Arizona Supreme Court had held that there was no basis for the death sentence. Thus there had been no "acquittal," at either level, and the Supreme Court could conclude that jeopardy had not attached:

> At no point during petitioners' first capital sentencing hearing and appeal did either the sentencer or the reviewing court hold that the prosecution had "failed to prove its case" that petitioners deserved the death penalty. Plainly, the sentencing judge did not acquit, for he imposed the death penalty. While the Arizona Supreme Court held that the sentencing judge erred in relying on the "especially heinous, cruel, or depraved" aggravating circumstance, it did not hold that the prosecution had failed to prove its case for the death penalty. Indeed, the court clearly indicated that there had been no such failure by remarking that "the trial court mistook the law when it did not find that the defendants 'commit-

ted the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value,' " and that "upon retrial, if the defendants are again convicted of first-degree murder, the court may find the existence of this aggravating circumstance," [citations omitted]. *Poland* at 1754–55.

This Court reads *Poland* to mean that the state may resentence a convicted murderer whose death penalty has been set aside, provided that no court has determined that the state failed to prove any other basis upon which a second death sentence might rest. In other words, if either the trial court or a reviewing court finds that, after removal of any infirm factors, the residual evidence offered by the state at the initial proceeding will not support a death verdict, then the state has failed in its proof and may not try again. Thus, as the Supreme Court stated, "the proper inquiry is whether the sentencer or reviewing court has 'decided that the prosecution has not proved its case' *that the death penalty is appropriate."* [emphasis in original]. *Poland* at 1755. Removal of one invalid factor leads to this conclusion *only* if there were no other valid factors adduced at trial that might have independently formed a proper basis for a death sentence.

In deciding *Poland,* the Court distinguished its earlier decision in *Arizona v. Rumsey.* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). In the latter case a 7–2 majority reaffirmed *Bullington, supra,* and held that the state could *not* resentence a convicted murderer when, on appeal, the Arizona Supreme Court determined that the trial court had erred in rejecting the prosecution's evidence of aggravating circumstances. As the trial judge in *Poland* had done, the trial court in *Rumsey* erroneously believed that the "pecuniary gain" circumstance was meant to apply in cases of contract killings only. Although the state court overturned that ruling, the state could not attempt to have the trial court resentence Rumsey because the trial court had found no basis for the death penalty. To do so would have ex-

posed the defendant to double jeopardy. Thus, the distinction between *Rumsey* and *Poland* was that some court, the trial judge in this particular instance, had determined that there was no evidence in the record to warrant the death sentence. And notwithstanding that an error in interpreting the state law undergirded that determination, the Supreme Court deemed the trial judge's findings as former jeopardy:

> In making its findings, the trial court relied on a misconstruction of the statute defining the pecuniary gain aggravating circumstance. Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits. *Rumsey* 104 S.Ct. at 2310.

For purposes of the Double Jeopardy Clause, the only significant difference between the *Rumsey* case and the case pending before this Court is the source of the determination that the prosecution had not proved any basis for the death sentence. In *Rumsey* it was the trial judge; in the instant case, a federal court acting pursuant to habeas corpus review made the determination. This difference does not alter the double jeopardy consequences, as the Supreme Court has attested:

> If the District Court had so held in the first instance, as the reviewing court said it should have done, a judgment of acquittal would have been entered and, of course, petitioner could not be retried for the same offense. [citations omitted]. Consequently, as Mr. Justice Douglas correctly perceived in *Sapir,* [*v. United States,* 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955)], it should make no difference that the reviewing court, rather than the trial court, determined the evidence to be insufficient. [citations omitted].... To hold otherwise would create a purely arbitrary distinction between those in petitioner's position and others who enjoy the benefit of a correct decision by the District Court. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978).

A recent Eleventh Circuit case illustrates this principal. *Young v. Kemp,* 760 F.2d 1097 (1985). Like the instant case, *Young* involved a federal habeas appeal of a state conviction. The district court upheld the petitioner's conviction but set aside the death penalty on the grounds that there was "no evidence that Young had formed the intent to rob his victim prior to the killing, and thus, the murder was not perpetrated while Young was engaged in another capital felony (i.e., armed robbery), nor for the purpose of receiving money." *Young* at 1100. On appeal, the circuit court reversed the district court's finding with regard to the validity of the conviction. Because it held that petitioner's trial counsel had been unconstitutionally ineffective, the appellate court ordered a new trial. The circuit court merely noted the district court's finding concerning the sentence but did not address this aspect of the lower court ruling.

In advance of the retrial, the state indicated that it would again seek the death sentence. Young argued that for the state to do so would constitute double jeopardy since the district court had found the previous death sentence unsupported by the evidence. The Eleventh Circuit agreed with the petitioner, concluding:

> that the previous judgment of this court left intact the district court's finding of insufficient evidence to support the death sentence. That being the case, the double jeopardy principles announced in *Burks v. United States,* and *Bullington v. Missouri,* prevent the state from seeking the death penalty in Young's retrial. "[citations omitted].

*Young* at 1101.

This Court's August 28, 1986, finding that the petitioner's death sentence rested on a single, aggravating factor which is invalid under *Collins,* places the instant case within the *Rumsey* and *Young* classifications, rather than that of *Poland.* By removing the sole aggravating factor and determining that the record is devoid of any other basis for a death penalty verdict, this Court effectively acquitted the petitioner of the case brought against him during the penalty phase. As *Poland* affirms, the state would have every right to resentence petitioner if this Court's nullification of the pecuniary gain factor had not reduced the quantum of statutorily designated aggravating evidence put forward at trial to zero. The Court notes that the facts present in *Poland* more closely resemble the situation in this Court's recently decided case of *Perry v. Lockhart,* 656 F.Supp. 46, also decided on August 28, 1986, wherein the Court invalidated a death sentence because *one of the three* aggravating factors relied on was invalid but permitted the state to resentence Perry because of the presence of other factors in the record that would support a death penalty.

The state contends that, in fact, the record still contains evidence that would justify a death sentence if Arkansas' present death penalty statute is considered. The state claims that the penalty phase adduced evidence that petitioner's conviction involved a murder that was "committed in an especially heinous, atrocious or cruel manner," and that such evidence constitutes an aggravating circumstance upon which the death sentence might be imposed under current law. Ark.Stat.Ann. § 41–1303(8). The state concedes that the law did not provide for this particular aggravating circumstance when petitioner was sentenced, but nevertheless contends that the fact that Arkansas has recently created this aggravating circumstance means that this Court can now conclude that there is a basis in the existing record of the penalty phase upon which a death sentence could be rested.

█ The state's theory is severely flawed in the Court's view. It is unmistakably clear that the Court may not rely upon subsequent amendments in the statutory aggravating circumstances to find a basis for a death sentence that could not have been imposed under the controlling state law at the time the jury considered the aggravating circumstances in petitioner's case. The Arkansas death penalty statute

in effect at the time of the petitioner's sentencing set forth seven aggravating circumstances:

Aggravating circumstances shall be limited to the following:

(1) the capital murder was committed by a person imprisoned as a result of a felony conviction;

(2) the capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

(3) the person previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person;

(4) the person in the commission of the capital murder knowlingly created a great risk of death to a person other than the victim;

(5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

(6) the capital murder was committed for pecuniary gain; or

(7) the capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any government or political function.

Ark.Stat.Ann. § 41–1303, Acts 1975, 280.

To these the General Assembly added an eighth aggravating circumstance in 1985: "(8) the capital murder was committed in an especially heinous, atrocious or cruel manner." But of the seven which were available at the time, the prosecution only submitted for the jury's consideration number 6, "pecuniary gain." The jury concluded that this circumstance was present beyond a reasonable doubt and nothing else. But assume for the moment that the jury had determined that reliance on pecuniary gain was invalid, as this Court subsequently determined, and that they had also determined, by noting on the verdict form or otherwise indicating it, that the murder was committed in an especially heinous fashion even though that factor was not actually submitted by the prosecutor. Arkansas law, as it read then, would not have allowed the jury to impose a death sentence on the basis of that conclusion. What the state proposes by its argument that the new aggravating circumstance be considered in this case is that the state be allowed to return to the penalty phase with the benefit of the new list of aggravating circumstances and claim that the record can now be read to justify a death sentence, notwithstanding that the jury could not have returned a death verdict if they ignored the invalid circumstance of pecuniary gain, regardless of the evidence that the crime was "especially heinous, atrocious and cruel." The "especially heinous" aggravating circumstance simply was not a factor under the law at the time. That it now is one of the factors that may be introduced makes no difference to the situation which existed at the point when Singleton was sentenced and therefore has no impact upon the double jeopardy analysis in this situation.

The folly of the state's argument is exposed by considering the following hypothetical case. Assume that the state tries to convict an individual for an alleged statutory violation requiring proof of four elements but that the jury, finding only three of the elements, acquits the defendant. Shortly thereafter the legislature amends the statute by paring one of the previously required elements, leaving the three elements that the jury had found with respect to the now-acquitted defendant's case.

■ No one would seriously suggest that the Double Jeopardy Clause would allow the government to go back and ask for a conviction of this individual based on the three elements which the jury had found and based on the legislature's amending the statute so as to eliminate any requirement of the fourth. Yet, in effect, that is exactly what respondent here would have the Court do by asking this Court to conclude that the amended death penalty statute may be used to establish a basis in the pre-existing record for the imposition of a death sentence, such that the Court

should not find that the Double Jeopardy Clause bars resentencing of petitioner. The only difference between the hypothetical case and the instant facts is that in this case the reviewing court, rather than the jury in the trial court, determined that the record did not contain sufficient evidence of aggravating circumstances under the law to provide a basis for the verdict requested by the government, namely the death sentence. As *Kemp, supra,* and *Burk, supra,* both make plain, this is an immaterial distinction and the defendant who is "acquitted" by the reviewing court is entitled to no less protection from Double Jeopardy than the defendant who is acquitted at the trial court by the jury. Thus the Court rejects respondent's contention that the record as developed in the original sentencing might still support a death sentence, even after removal of the pecuniary gain matter, and that this case is therefore like the situations presented in *Perry* and *Poland.*

In short, the difference between the outcome in *Perry* and *Poland* on the one hand, and this case on the other, is that the order toppling the death sentences in the former cases did not remove from the record every possible basis for the death sentence. In both the *Poland* case and this Court's decision in *Perry,* the review of the death sentence resulted only in a finding that the death sentence was flawed, not that there was no basis for it. By contrast, the state is bound in the instant case by its previous effort because there were no aggravating factors proved in the initial trial other than the one deemed invalid in the August order. Thus the Double Jeopardy Clause prevents the states from attempting to sentence the petitioner to death for a second time. The Court further notes that an analysis of the respondent's argument pursuant to the Ex Post Facto Clause of the Constitution would lead to the same conclusion.

It is therefore ORDERED that the respondent shall be, and it is hereby, prohibited from retrying the death penalty phase of petitioner's case.

It is further ORDERED that the respondent be, and it is hereby, required to reduce the petitioner's sentence to life without parole.