# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1492

_____

| | | |
|---|---|---|
| Charles Laverne Singleton, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal From the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Larry Norris, Director, Arkansas | * | |
| Department of Correction, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  March 7, 2001

Filed: October 12, 2001

_____

Before WOLLMAN, Chief Judge, HEANEY and BRIGHT, Circuit Judges.

_____

HEANEY, Circuit Judge.

Charles Laverne Singleton appeals the district court's order denying his petition for a stay of execution.  We reverse and remand to the district court with directions to grant Singleton's petition, enter a permanent stay of execution, and reduce Singleton's sentence to life imprisonment without the possibility of parole.

# I. BACKGROUND

## A. Procedural History From 1979-2000

Singleton, a black male, was convicted in Arkansas state court in 1979 of the capital felony murder of Mary Lou York, a white female, and of aggravated robbery. He was sentenced to death for the murder and to life imprisonment for the robbery. Singleton's conviction and sentence for capital felony murder were affirmed by the Arkansas Supreme Court in November 1981, but the aggravated robbery conviction and sentence were vacated on double jeopardy grounds. Singleton v. State, 623 S.W.2d 180 (Ark. 1981). Singleton unsuccessfully sought post-conviction relief under Arkansas Rule of Criminal Procedure 37, and the United States Supreme Court denied certiorari. Singleton v. Arkansas, 459 U.S. 882 (1982). Arkansas later set an execution date of June 4, 1982, and the Arkansas Supreme Court denied Singleton's request for a stay.

Singleton promptly filed a motion for a stay of execution in the United States District Court for the Eastern District of Arkansas, claiming, inter alia, that (1) he was not competent to be executed under Ford v. Wainwright, 477 U.S. 399 (1986); (2) he was denied his constitutional right to a jury selected from a venire representing a fair cross-section of the community where he was tried; and (3) he was denied his constitutional right to effective assistance of counsel. On June 1, 1982, the district court granted a stay of execution. After an evidentiary hearing, the district court granted Singleton's petition for a writ of habeas corpus, holding that Singleton's death sentence was invalid under the Eighth Amendment because the State had relied on an invalid aggravating factor, namely, that Singleton had acted for pecuniary gain. Citing Collins v. Lockhart, 754 F.2d 258 (8th Cir. 1985), the court held that pecuniary gain was not a valid aggravating factor because it was also an element of the robbery-murder charge. The district court sustained the conviction, prohibited the State from retrying the penalty phase of Singleton's case, and required the State to reduce his

sentence to life without parole. Singleton v. Lockhart, 653 F. Supp. 1114, 1144 (E.D. Ark. 1986).

Both Singleton and the State appealed from the district court's order. Singleton raised the issues that had been decided adversely to him in the district court, including the Ford claim. The State argued the district court erred in retroactively applying Collins and prohibiting the State from retrying the penalty phase of Singleton's trial. This court affirmed the district court's ruling upholding the conviction but reinstated the death sentence, holding that Collins had been overruled by a subsequent decision of this court.[1] Because the district court did not reach the merits of Singleton's Ford claim, we did not address the issue. Singleton v. Lockhart, 871 F.2d 1395 (8th Cir.), cert. denied, 493 U.S. 874 (1989).

On remand, Singleton challenged the reinstatement of the death sentence and raised other issues. On July 12, 1990, the district court dismissed Singleton's petition and dissolved the stay of execution. Singleton v. Lockhart, No. 82-165, slip op. (E.D. Ark. July 12, 1990). Singleton appealed, arguing he received ineffective assistance of counsel during the penalty phase of his trial, and the Arkansas death penalty statute was unconstitutional. We affirmed the district court's denial of Singleton's petition. Singleton v. Lockhart, 962 F.2d 1315 (8th Cir.), cert. denied, 506 U.S. 964 (1992).

In December 1992, Singleton filed an action in state court claiming he was incompetent to be executed, citing the Arkansas Constitution and Ford. He requested an order that the State cease administration of antipsychotic drugs and conduct a psychiatric examination in accordance with Ford. Singleton also sought a declaratory judgment that he was not competent to be executed and that Arkansas violated his

---

[1]Perry v. Lockhart, 871 F.2d 1384, 1393 (8th Cir. 1989) (holding that Collins was implicitly overruled by Lowenfeld v. Phelps, 484 U.S. 231 (1988)).

rights by medicating him to make him appear competent. The state court concluded that Singleton had satisfied state exhaustion requirements by seeking an evaluation of his mental condition pursuant to Ark. Code Ann. § 16-90-506(d)(1) (Supp. 1999),[2] but denied his motion. On appeal, the Arkansas Supreme Court held that § 16-90-506(d)(1) was not unconstitutional and that Singleton had not been improperly denied a competency examination. The court noted that Singleton sought the same relief in a pending federal habeas petition. See Singleton v. Endell, 870 S.W.2d 742 (Ark. 1994), cert. denied, 513 U.S. 960 (1994).

Singleton filed the 28 U.S.C. § 2254 petition referred to by the Arkansas Supreme Court in 1993, raising claims of double counting, actual innocence, and Ford incompetency. The district court held Singleton's petition in abeyance while the

---

[2]The relevant portions of § 16-90-506(d)(1)(B) provide:

(d)(1) When the Director of the Department of Correction is satisfied that there are reasonable grounds for believing that an individual under sentence of death is not competent, due to mental illness, to understand the nature and reasons for that punishment, the director shall notify the Deputy Director of the Division of Mental Health Services of the Department of Human Services. The Director of the Department of Correction shall also notify the Governor of this action. The Division of Mental Health Services shall cause an inquiry to be made into the mental condition of the individual within thirty (30) days of receipt of notification. The attorney of record of the individual shall also be notified of this action, and reasonable allowance will be made for an independent mental health evaluation to be made. . . .

. . . .

(B) If the individual is found incompetent due to mental illness, the Governor shall order that appropriate mental health treatment be provided. The director may order a reevaluation of the competency of the individual as circumstances may warrant.

state court litigation proceeded. After the Arkansas Supreme Court handed down its decision in 1994, the district court held two hearings on Singleton's petition in May and July 1995. Thereafter, the district court dismissed his petition, concluding that Singleton–who was at that time voluntarily taking antipsychotic medication–was competent to be executed. It also rejected his double-counting and actual-innocence claims. Singleton appealed the district court's decision with regard to the double-counting claim. Although Singleton raised the possibility that he might have a claim of incompetency in the future, he conceded he had no support for such a claim at that time because he was voluntarily taking his antipsychotic medication and was competent while medicated. Singleton did not appeal the denial of his actual-innocence claim. We affirmed the district court, stating:

> Singleton makes no claim that he is currently incompetent to be executed. Accordingly, the district court's ruling on that stands unchallenged and is thus affirmed. Our ruling on this issue does not foreclose Singleton from raising a future claim of incompetence based upon conditions different from those that led to the district court's ruling in the present case, subject, of course, to whatever procedural objections the State may raise to such a claim.

Singleton v. Norris, 108 F.3d 872, 874 (8th Cir.), cert. denied, 522 U.S. 840 (1997).

## B. Singleton's Medical History From 1979-2000

Singleton has spent much of his time in prison on psychotropic medication. Shortly after Singleton entered prison, the State placed him on medication primarily to control his anxiety and depression and to help him sleep. In July 1987, Singleton began to experience visual hallucinations and complain that his cell was possessed by a demon. He believed that a prison doctor had placed an implement in his ear, that his thoughts were taken from him when he read the Bible, and that other inmates knew what he was reading. He also lost a good deal of weight. Singleton's

psychiatrist, Dr. W. R. Oglesby, believed Singleton was schizophrenic[3] and placed him on antipsychotic medication.  Singleton's condition improved, but in October 1987, Singleton refused to take his medication, and Oglesby ordered that he be involuntarily medicated.

Singleton remained involuntarily medicated until June 1988.  At that point, Oglesby noted an improvement in Singleton's condition and discontinued his medication.  Singleton's psychosis did not stay in remission for long, however, and by October of that year, Singleton was again delusional and experiencing visual and auditory hallucinations.  Oglesby ordered Singleton involuntarily medicated, which continued until June 1991, when Oglesby discontinued the medication "to see how long [Singleton] could go without having any further mental symptoms."  (Mrad Report of 8/14/00, at 7.)  Within five months, Singleton was delusional and stripping off his clothes, talking loudly, and accusing the prison staff of using "subliminal suggestions" on him.  (Id.)  Once again, the State placed Singleton on an involuntary medication regime.

The State continued to involuntarily medicate Singleton from November 1991 to March 1995.  Nevertheless, in June and July 1993, Singleton complained of seeing his food turn into worms and his cigarettes turn into bones, and asked to be castrated for religious reasons.  The response was to increase his antipsychotic medication, and by the end of July, he was no longer experiencing hallucinations.

In response to Singleton's 1993 federal habeas petition and with the agreement of the parties, the district court entered an order directing that Singleton be sent to the Federal Medical Center (FMC) in Springfield, Missouri in February and March 1995

---

[3]Singleton was diagnosed as paranoid schizophrenic with anxiety as early as August 1983.  He was placed on antipsychotic medication, but the record does not reflect the length of time he remained on the antipsychotic drugs.

to determine whether he was competent to be executed and, if so, whether he would remain competent if his medication was discontinued. The FMC's clinical psychiatrist, Dr. David Mrad, conducted the evaluation. He concluded that Singleton was <u>Ford</u> competent to be executed, and that if the State discontinued Singleton's medication, he "might remain competent for some period of time without medication before becoming psychotic." (Mrad Report of 8/14/00, at 8.) Mrad could not, however, determine exactly when that would be.

Singleton returned to prison in March 1995 and was placed on a voluntary medication regime until September 1996, when he asked to discontinue his medication. A prison psychiatrist agreed. By April 1997, however, Singleton had become withdrawn and unintelligible and had lost weight. Oglesby, believing Singleton was psychotic, again prescribed medication, which the records indicate he took only half the time. When Oglesby evaluated Singleton two months later, he determined Singleton was not taking the medication. Notwithstanding this fact, Oglesby did not place him on an involuntary medication regime because Singleton did not appear delusional or a danger to himself or others.

By the end of July 1997, Oglesby's opinion had changed. Singleton told a prison doctor that he was on a mission from God to kill Oglesby and the President, and that this court and the United States Supreme Court had set him free. The doctor also reported Singleton refused to take his medication. Singleton continued to display eccentric behavior and expressed a belief that he was God and had been set free in early August 1997. Oglesby believed Singleton was psychotic and recommended that the prison's Medication Review Panel evaluate Singleton so the State could medicate him.

Singleton continued to display eccentric behavior, indicating he believed he was God and the Supreme Court. On August 13, the prison doctor reported that Singleton had shredded his mattress and stuffed it in the toilet, sink, and air vents;

Singleton was also not eating. On August 14, Oglesby opined that Singleton was possibly suicidal and a danger to himself and the security of the prison. On August 15, Singleton flooded his cell.

The Medication Review Panel held a hearing on August 18. At the hearing, Singleton told the panel that he did not want to take medication and that he had consented to taking his medication in the past only to avoid a fight with the prison. Singleton also told the panel that his sentence had been overturned, that the State was holding him illegally, and that there was a conspiracy to execute him. After considering Singleton's history and demeanor, as well as his weight loss and refusal to eat, the panel concluded that "some of [Singleton's] behavior during the interview suggest[ed] he could represent a danger to others" and that "[h]is ongoing weight loss and reported refusal to eat could [have] pose[d] a threat to his well being." (Appellant's App. at 63.) The panel unanimously agreed to involuntarily medicate Singleton.

Oglesby immediately placed Singleton on an involuntary medication regime. For the next two months Singleton remained delusional and continued to believe his sentence had been overturned; however, his mood improved, he was eating more, and he was not hostile or aggressive. Oglesby's November and December 1997 evaluations indicate that Singleton's psychosis was in remission except for a period in early December when Singleton experienced visual hallucinations.

On the scant record before this court, it appears that under involuntary medication Singleton's mental condition slowly improved over the next thirteen months. Although Singleton had problems sleeping and was restless and nervous, he did not have a psychotic episode until February 1999, when the prison staff reported he was withdrawn and had an exaggerated speech pattern. Singleton's medication was increased, but he reported hearing voices and was aggressive toward the staff in

April 1999. Oglesby gave Singleton additional medication, and by August 1999, he believed Singleton's psychosis was in remission.

## C. Current Litigation

It appears Singleton's psychosis remained in remission into January 2000. Sometime during that month, the State scheduled Singleton's execution for March 1, 2000. On February 10, 2000, Singleton filed a pro se motion for the appointment of counsel and a petition for permission to file a successive writ of habeas corpus with this court; both were denied. Shortly thereafter, Singleton filed a petition pursuant to 28 U.S.C. § 2241 arguing that Ford prevented the State from involuntarily medicating him to achieve his competency and then executing him for his crimes. The district court disagreed and denied his petition, stating:

> Mr. Singleton is presently being involuntarily medicated in accordance with the substantive and procedural requirements of the law. As this Court said in 1995, it does not have authority to order Mr. Singleton off of his medically prescribed drugs. To do so would be contrary to his medical best interests. And the Court concludes that under the law there is no need to order the defendant to stop medicating him. Why? Because the current law only prohibits medicating an incompetent death row inmate when the sole purpose is to make him competent so that the State can execute him. . . . There's no evidence in this record that the actions and decisions of the medical personnel involved were in any degree motivated by the desire, purpose or intent to make Mr. Singleton competent so that he could be executed.

(Tr. of 2/16/00 Hr'g, at 94-95.)

With the district court's permission, Singleton appealed to this court and we stayed his execution. On appeal, Singleton reargued the merits of his petition, but the State refused to concede that Singleton would become Ford incompetent if he did not

receive his medication. We determined that underlying the parties' arguments were two unanswered questions of fact. First, was Singleton Ford competent at the time the State began to medicate him? Second, assuming medication rendered Singleton Ford competent, if the State stopped involuntarily medicating him, would Singleton regress into psychosis and become incompetent to be executed once the effects of his medication had fully dissipated? To resolve these questions, we remanded the case to the district court.

Before the district court could respond to our order of remand, in March 2000, Singleton's counsel informed the court that Singleton had just discovered that the State was no longer involuntarily medicating him. Apparently in January 2000, a prison psychiatrist had decided not to return Singleton to the Medication Review Panel for another involuntary medication order, but instead recommended allowing Singleton to take his medication voluntarily. However, neither the psychiatrist nor the panel informed Singleton of this change. The parties stipulated that Singleton had received his medication in January, February, and March 2000, but that he had refused to take his April 2000 medication once he learned he was no longer required to take it. He did, however, receive his May 2000 injection. Nevertheless, we directed the district court to comply with our order of remand. With the parties' consent, the district court returned Singleton to the FMC for an evaluation designed to answer the questions posed by our order of remand.

Singleton remained at the FMC from June 29 to August 14, 2000 and was evaluated by Mrad. Singleton told Mrad that he experienced hallucinations as early as ages twelve and fourteen. His mother told him he needed to see a psychiatrist, but instead Singleton used drugs and alcohol to feel better. Singleton also told Mrad that he heard voices in 1978 telling him he could resurrect his deceased brother and sister

if he had "incest with the family" and that he heard a voice just days before the murder telling him he was going to go to prison.[4] (Mrad Report of 8/14/00, at 4.)

---

[4]We detailed Singleton's medical history in a previous opinion:

Prior to trial, [Singleton's counsel] requested that Singleton be given a psychiatric examination. Accordingly, Singleton was sent to the Arkansas State Hospital, where he was administered a battery of tests and was examined by a psychologist and a psychiatrist. The results of the tests and the examination revealed that Singleton has a full scale IQ of 83, which places him within the dull normal range of intellectual functioning. He appeared to be reading at nearly a seventh grade level. . . .
The examining psychiatrist's report concluded that:

> It is the opinion of the examining psychiatrist that Charles Lavern Singleton is not mentally ill to the degree of legal irresponsibility at the time of this examination and probably was not at the time of the commission of the alleged offense.

> It is further the opinion of the examining psychiatrist that Mr. Singleton has the mental capacity to understand the proceedings aginist [sic] him and has the mental capacity to assist effectively in his own defense; and, that he was probably not suffering from mental disease or defect of such degree as to make him unable to appreciate the criminality of his conduct or to conform his conduct to the requirments [sic] of the law.

The examining psychiatrist's report showed Singleton's diagnosis to be: "1) Without psychosis 2) Habitual Excessive Drinking 3) Antisocial Personality, Severe."

Singleton v. Norris, 962 F.2d at 1318.

The district court observed in its June 2, 1995 opinion that "Mr. Singleton's medical history and his own testimony suggest[ed] that he may have had mental

-11-

Turning to the question of whether Singleton was <u>Ford</u> competent prior to August 1997, Mrad reported that Singleton's medical records from that time indicated he had not received medication for eleven months, was displaying psychotic symptoms, and believed he was God and his conviction had been overturned by the Supreme Court. Based on this, Mrad concluded:

> According to the <u>Ford</u> criteria, a prisoner must be aware of the punishment they are about to receive (execution) and the reason for it. Prior to his involuntary medication in August 1997, it appears Mr. Singleton was acutely psychotic and believed he was God. Given that belief, it is unlikely he is capable of frequently appreciating that he could be executed. Even more specifically, Mr. Singleton had frequently expressed the belief his sentence had been overturned and he had been set free by the Supreme Court. He further expressed the belief that he was being held as a result of a conspiracy in spite of that court mandate. If Mr. Singleton truly believed those delusional ideas, which is likely given his psychotic state at the time, then it does not appear he would have been able to appreciate the reason for his being executed at that time.

> Based on the above information, it is my opinion that in August 1997 prior to the imposition of involuntary medication, Mr. Singleton was not competent to be executed under the <u>Ford v. Wainwright</u> criteria in that he was unable to appreciate that he was going to be executed and unable to appreciate the reason for the execution, believing that he was no longer being held for the robbery-murder of Mary Lou York, but as the result of a conspiracy to execute him.

(Mrad Report of 8/14/00, at 14-15.)

---

problems, and even psychotic episodes, as early as age twelve." <u>Singleton v. Norris</u>, No. PB-C-93-425, slip op. at 8 (E.D. Ark. June 2, 1995).

In responding to the second question posed by our order of remand, Mrad stated:

> The question of whether Mr. Singleton would become incompetent to be executed if his medication were to be discontinued assumes the premise that Mr. Singleton is presently competent. Based on the clinical presentation he has displayed during the current evaluation, I am uncertain that Mr. Singleton would be considered to currently meet the Ford criteria. Unlike his presentation in 1995, Mr. Singleton's thinking is much more disorganized, and he is preoccupied with religious themes. Although some of his ideas may simply reflect traditional religious beliefs about an afterlife or reincarnation, he also appears to be displaying thoughts of a much more pathological nature. He believes in a parallel universe. He has repeatedly expressed unusual ideas about death, referring to it as simply stopping breathing and then being brought back somewhere else (a power he seemed to attribute to judges). He has repeatedly referred to himself as the Holy Spirit. He has expressed some bizarre ideas about the purpose of the death of Mary Lou York (the victim of the crime for which he has been sentenced). Although the court has not specifically requested an opinion concerning Mr. Singleton's present competency to be executed, it appears this issue must be addressed in the context of the question of whether he would become incompetent without medication.

(Id. at 15-16.) Mrad reported that Singleton was also difficult to follow and described himself as being a marionette and God was moving his strings. He believed that he and St. John were tasked with fighting homosexuals, and that Sylvester Stallone and Arnold Schwartzenegger were somewhere between this universe and another universe and were trying to save him. In addition, Singleton told Mrad he was not concerned with death because death was nothing, and that during a 1997 suicide attempt (which no one witnessed), he had cut his jugular three times but it spontaneously stopped bleeding. (Id.)

-13-

Mrad stated that while Singleton's medical history indicated he would become psychotic if he did not take his medication, he was uncertain how much time would elapse before Singleton became psychotic or incompetent to be executed, nor would he speculate how much time would pass before the effects of the medication dissipated from Singleton's system. Singleton's medical records reflected that on one occasion he became psychotic within four months of discontinuing his medication, while on another he became psychotic within five months of discontinuing his medication. Singleton's 1997 medical records indicated that he had not received his medication for eleven months before the State began to involuntarily medicate him, but he had begun to display psychotic symptoms within seven months of his medication. Mrad noted a period of time in 1993 when Singleton was psychotic even while he was on medication.

Mrad closed his report by noting that Singleton had failed to take his April 2000 medication, and that it was "possible that following an extended period of consistent adequate medication, Mr. Singleton will once again display the level of improvement and rationality he demonstrated during his previous evaluation." (Id. at 16.)

On the basis of Mrad's opinion, the district court found that Singleton was not Ford competent to be executed when the State began to involuntarily medicate him in August 1997, and would regress into psychosis without the medication; however, it stated it could not be certain when Singleton would become psychotic or if Singleton would also become Ford incompetent. The court did not make a factual finding as to whether Singleton was currently competent to be executed because it was not asked to do so in the order of limited remand.

## II. Discussion

At the outset, we note that the State of Arkansas believes that this controversy is moot because Singleton is currently taking his medication voluntarily. It believes, however, that Singleton's petition should be considered on the merits and resolved once and for all in light of an exception to the mootness doctrine, an exception it believes exists in this case because it is highly probable that Singleton will not continue to take his medication voluntarily. See Murphy v. Hunt, 455 U.S. 478, 482 (1982) (per curiam) (holding case is not moot if there is "reasonable expectation" or "demonstrated probability" that same controversy will arise at some point in future) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam)).

The State argues that this appeal nevertheless presents no justiciable case or controversy, and asks this court to dismiss Singleton's appeal on this basis in light of the findings entered on remand that it cannot be known at this time whether Singleton will be Ford incompetent in the future. The State asserts that Singleton will have to raise that issue if he becomes incompetent under the dictates of Ford. The State adds that if we decide the case on the merits, we should affirm the district court and permit Singleton's execution to go forward.

For the reasons that follow, we agree with the State that the issue should be decided on the exception to the mootness doctrine. Contrary to the State's view, however, we conclude that the issue is justiciable and that the State should be enjoined from executing Singleton now or in the future.

In reaching our opinion, we are guided by the Supreme Court's decisions in Ford and Washington v. Harper, 494 U.S. 210 (1990). In Ford, the Court was presented with the question of whether the Constitution places a substantive restriction on the State's power to execute an insane prisoner. 477 U.S. at 405. The Court recognized that the Eighth Amendment's ban on cruel and unusual punishment

-15-

prohibited not only those punishments that the common law considered cruel and unusual at the time the Bill of Rights was adopted, but also those punishments that violate "evolving standards of decency that mark the progress of a maturing society." Id. at 406. The Court reviewed the common law, and determined that it uniformly condemned the execution of the insane as inhumane, savage, and having no deterrent or retributive value; and that contemporary society has embraced these common law principles by enacting laws that prohibit the execution of the insane:

> Today, no State in the Union permits the execution of the insane. It is clear that the ancient and humane limitation upon the State's ability to execute its sentences has as firm a hold upon the jurisprudence of today as it had centuries ago in England. The various reasons put forth in support of the common-law restriction have no less logical, moral, and practical force than they did when first voiced. For today, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life. Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane. Whether its aim be to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the restriction finds enforcement in the Eighth Amendment.

Id. at 409-10 (citations omitted). In his concurring opinion, Justice Powell articulated the test for competency to be execution: "[T]he Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." Id. at 422 (Powell, J., concurring); see also Rector v. Clark, 923 F.2d 570, 572 (8th Cir. 1991) (in determining prisoner's competency to

be executed, court must assess (1) whether prisoner understands that he is to be punished by execution, and (2) whether prisoner understands why he is being punished).

In Harper, the Supreme Court considered a state prisoner's substantive and procedural due process challenges to a state prison regulation governing the forced medical treatment of inmates with antipsychotic drugs. Under the contested regulation, such medical treatment could be forced on a prisoner only when it was in his best medical interest and in the interest of his or others' safety in the prison. The regulation further provided that antipsychotic medication could be administered for no purpose other than medical treatment and then only under the direction of a licensed psychiatrist. See Harper, 494 U.S. at 222 n.8.

The Court acknowledged that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty, but held that given the state's unique interest in prison safety and security, substantive due process permits a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Riggins v. Nevada, 504 U.S. 127, 135 (1992) (quoting and interpreting Harper). Therefore, "[u]nder Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." Id.

While instructive, neither case answers the question of whether a state can involuntarily medicate an otherwise incompetent prisoner to protect him from harming himself or others and then execute the prisoner if the medication renders him Ford competent. The State and the district court believe the State's intent in medicating Singleton should control the case. They concede it would be unconstitutional for the State to involuntarily medicate Singleton for the express

-17-

purpose of rendering him competent to be executed, but they do not believe it is unconstitutional for the State to execute Singleton if he has achieved his competency through the involuntary medication administered to protect Singleton from harming himself or others.

Although we question whether <u>Harper</u>'s framework applies in this case, the problem with pinning the constitutionality of a prisoner's execution to the State's intent in involuntarily medicating him is that it will often be difficult to determine whether the State is medicating a prisoner to protect him from harming himself or others or whether the State is medicating the inmate to render him competent for execution. In such cases, the State can be expected to claim that it is medicating the inmate to protect him from harming himself and others, and the prisoner will almost certainly argue the State's proffered reasons are a pretext for rendering him competent to be executed. Once the parties reach this point, it is unclear whether due process would entitle the inmate to a hearing to challenge the State's proffered reasons for medicating him, and if so, whether an administrative or judicial tribunal will oversee the hearing. By the time this process works itself out, the inmate may have become incompetent to be executed, and the entire process will have to start again.

Regardless of whether we accept the State's position, we do not believe the State's intent in medicating Singleton is dispositive to the outcome of this case. The facts here are unique. Since 1987, the State has medicated Singleton with antipsychotic medication. While Singleton has occasionally consented to taking medication, the State has spent a majority of this time medicating Singleton against his will. The State, however, has not always administered Singleton's medication to him consistently. There have been numerous times over the last eighteen years when the State has discontinued Singleton's involuntary medication regime or permitted Singleton to stop taking his medication even though his medical history is clear that he will become psychotic without his medication. During these periods–and there have been many–Singleton slips from lucidity and <u>Ford</u> competence to psychosis and

Ford incompetence, and it is difficult to assess when he is Ford competent and when he is Ford incompetent. At his post-examination deposition, Mrad was asked to give an opinion as to whether Singleton would become psychotic if removed from his medication. He responded:

> I do have an opinion that based on his past history of several years now Mr. Singleton would become psychotic if we were off medication. It's much more difficult to try to accurately predict when exactly that would be. Looking through his record there was one period when he became--the records reflect that he was noticeably psychotic four months after medication was discontinued. There was another time when it was five months. In this particular instance, the '97 episode, it was actually--he was actually off medication for about 11 months, but there was evidence in his record that he was first showing changes in his mood and later showing psychotic symptoms by April of '97, which would have been 7 months after the medication was discontinued, so it's difficult to predict, and in addition to that there were [sic] at least one episode in his record--I believe in '93--when the records reflect he became psychotic even while he was taking the medication.

> And so that issue of the relationship between competency and his medication, particularly trying to predict when he would not only become psychotic but more specifically when he would become incompetent under the Ford criteria off medication, is fairly difficult. I don't know that I or anyone could accurately predict that, but it's not hard to predict based on past experience that if he's off medication for an extended period of time he will again be psychotic.

(Mrad Depo. of 10/24/00, at 27-28.)

Thus, even if we assume Singleton is Ford competent while on his medication–an assumption we hesitate to make–it appears that there is no way of knowing how long he will remain competent once the medication is discontinued or how long it will take him to regain Ford competency once he begins taking

-19-

medication. In short, there is no way for us to know whether Singleton will be competent on the day he is executed. This fact is made all the more troubling given the State's inconsistent administration of medication and its admission at oral argument that ninety days will elapse between the time an execution date is set and the date of execution.

Of even greater concern to us is Singleton's inability to retain lucidity and Ford competency even while he is medicated. The record reflects that at one point Singleton complained of visual hallucinations and requested castration even though he had been consistently medicated for twenty months; on another, he experienced hallucinations and exhibited psychotic symptoms after being on medication for seventeen months. In addition, Singleton experienced hallucinations while on medication even when Oglesby reported that his psychosis was in remission. The psychotic symptoms Singleton exhibited during these episodes are similar to the symptoms he exhibited when Mrad classified him as Ford incompetent in August 1997 and lead us to seriously doubt whether Singleton can be competent to be executed even while he is on his medication.

To summarize, we know that Singleton was Ford incompetent in 1997, and we know that he has been Ford incompetent much of the time that he has been confined in prison. This is not a simple case in which an inmate has been administered antipsychotic medication that has resulted in his reachieving competency and maintaining that status over a long period of time. In that circumstance, it could be said, consistent with the Supreme Court decision in Ford, that the inmate was aware of the punishment he was about to suffer and why he was about to suffer it. However, that cannot be said in this case. There is only one conclusion to be drawn from reading this entire record, and that is that Singleton does not have the understanding necessary to permit the State to execute him. It is therefore time to bring this case to an end and grant a permanent stay of execution. To do otherwise under the

circumstances of this case would, in the words of Justice Marshall, subject Singleton to "the barbarity of exacting mindless vengeance." Ford, 477 U.S. at 410.

Of course, the State may continue to medicate Singleton voluntarily or involuntarily as necessary to protect him and others, but it may not execute him in the future.

## III. CONCLUSION

We reverse the district court and direct it to grant Singleton's petition for a writ of habeas corpus and to enter a permanent stay of execution. The district court shall also reduce Singleton's sentence to life imprisonment without the possibility of parole.

WOLLMAN, Chief Judge, dissenting.

The Court's opinion spells out in thorough detail the lengthy procedural history of this case and explains the reasons why it is that Singleton has been on death row now for one month short of twenty-two years.

No one can dispute that Singleton has had a record of confused, delusional thinking and bizarre behavior during the nearly quarter-century that his case has wended itself through the state and federal judicial systems, marked by the State's need to from time to time involuntarily medicate him for his own safety and well-being.

That aside, what is at issue before us now is the answer to the question that we failed to ask the district court to address when we remanded the case to it in March

of 2000, which is whether Singleton is currently <u>Ford</u>-competent.  Having failed to pose that question to the district court, we now answer it ourselves.

I acknowledge that the Court's answer has a certain appeal, for it brings to a conclusion what might seem to be an endless round of competency hearings made necessary by the inevitable delay between a post-hearing finding of competency and a subsequently set execution date.  Had we asked the district court to answer the question we now answer ourselves, the outcome of this case may very well have been the same.  Loath as I am to see any further delay in this case, and as tempting as it is to join the Court in concluding that it is time to bring the case to an end, I do not believe that it is properly within our province to do so.

One further thought.  As I read the Court's opinion, it does not purport to answer the difficult constitutional question whether a state may execute someone who is <u>Ford</u>-competent only as a result of the forcible administration of psychotropic drugs.  <u>Cf.</u> <u>United States v. Weston</u>, 255 F.3d 873 (D.C. Cir. 2001), <u>petition for cert. filed</u> (Sept. 5, 2001) (No. 01-6161).

With all due respect to the Court's careful analysis of the history of this long-drawn-out case, I cannot join in the conclusion it reaches.  Much as I dislike the prospect of even more delay, I believe that we should attempt to secure a more definitive answer to the question that we should have asked.  If the answer to that question is that there can be no definitive answer, then the State will have failed to satisfy its <u>Ford v. Wainwright</u> burden.  Unattractive as further delay might appear to be, I do not believe that further proceedings that might enable the State to impose in a constitutionally permissible manner the punishment that its judicial system has deemed to be the appropriate sanction for Mary York's senseless death would constitute the exaction of mindless vengeance.  Accordingly, I respectfully dissent.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.